UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

GUEST-TEK INTERACTIVE ENTERTAINMENT
INC., and GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.,

                Plaintiffs,

v.

THOMAS PULLEN and PUREHD LTD.,

                Defendants.

## VERIFIED COMPLAINT AND JURY DEMAND

The plaintiffs, Guest-Tek Interactive Entertainment, Ltd. and Guest-Tek Interactive

Entertainment Inc., by and through their attorneys, complain against the defendants, Thomas

Pullen, and PureHD Ltd., as follows:

### INTRODUCTION

1.     This is an action for, among other things, injunctive relief and monetary damages

for violation of the Lanham Act, 15 U.S.C. § 1125(a), and for the misappropriation and misuse

of the confidential and proprietary business information and trade secrets of Guest-Tek

Interactive Entertainment, Ltd. ("Guest-Tek, Ltd.") and its wholly owned subsidiary, Guest-Tek

Interactive Entertainment, Inc. ("Guest-Tek, Inc.")(unless otherwise noted, Guest-Tek, Ltd. and

Guest-Tek are together referred to as "Guest-Tek").  Guest-Tek is in the business of providing

broadband high speed Internet access, Voice over internet protocol, cable television signal and

video on demand services and equipment to the hospitality industry, universities, healthcare

institutions, timeshare units and multiple dwelling units.  The defendant, Thomas Pullen

("Pullen"), was employed by Guest-Tek, Inc. as its Vice President of North American Sales until

he voluntarily and abruptly resigned his employment on Sunday, May 3, 2009, after establishing

a competing entity, defendant PureHD Ltd. ("PureHD").  Pullen was highly compensated by

Guest-Tek, Inc., receiving compensation in excess of $258,000 in 2008.  Guest-Tek has since

discovered that for months prior to submitting his resignation, Pullen engaged in a concerted

campaign to acquire Guest-Tek's trade secrets and confidential and proprietary information for

his personal benefit and the benefit of PureHD.  Indeed, Pullen took steps to create a competing

enterprise as early as August 2008.  To that end, for over eight (8) months he hid his intentions

from Guest-Tek and deceptively misappropriated confidential information and trade secrets to

use on behalf of a competing enterprise.  For example, a forensic review of Pullen's laptop

computer reveals that Pullen copied numerous confidential documents to external USB drives,

and, upon information and belief, he burned his entire Outlook email inbox, contacts and

calendar to a DVD disc that he has not returned.  Pullen's Outlook inbox contains thousands of

confidential emails and attachments, including confidential pricing information and product

offerings contained in many of Guest-Tek's submissions to various hoteliers requests for

proposals.  Despite repeated demand, Pullen has refused to return this electronic media and these

records to Guest-Tek.  Having unlawfully stolen Guest-Tek's confidential and proprietary

business information, upon information and belief Pullen is now using that information to

compete against Guest-Tek through PureHD.  Not limiting his misconduct to misappropriating

confidential information and trade secrets, Pullen further breached his duties by working with

one of Guest-Tek's biggest competitors in establishing PureHD while he was employed as

Guest-Tek's Vice President.  Guest-Tek now brings this action against Pullen and PureHD for both injunctive relief and monetary damages.

## PARTIES

2.      The plaintiff, Guest-Tek Interactive Entertainment Ltd., is a Canadian corporation incorporated under the Alberta Business Corporation Act, with a principal place of business located in Calgary, Canada, and which is publicly traded on the Toronto Stock Exchange.

3.      The plaintiff, Guest-Tek Interactive Entertainment Inc., is a California corporation with a principal place of business located in Irvine, California.  Guest-Tek Interactive Entertainment Inc. is a wholly owned subsidiary of Guest-Tek Interactive Entertainment Ltd.

4.      The defendant, Thomas Pullen, resides in Sudbury, Middlesex County, Commonwealth of Massachusetts.

5.      The defendant, PureHD Ltd., is a Canadian corporation incorporated under the Nova Scotia Companies Act, with, according to its website, a principal place of business located in Sudbury, Commonwealth of Massachusetts.  Pullen is the founder and President of PureHD.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      This Court has personal jurisdiction over Pullen because he lives in Sudbury, Massachusetts.  Pullen worked for Guest-Tek out of a home office located in Sudbury, Massachusetts and, upon information and belief, it was from the Sudbury location that Pullen misappropriated Guest-Tek's confidential and proprietary information, breached his fiduciary duties to Guest-Tek, and established PureHD.

8.    This Court has general and specific personal jurisdiction over PureHD because PureHD operates from an office in Sudbury, Massachusetts.  Upon information and belief, Guest-Tek's misappropriated information is located in its office in Sudbury, Massachusetts and PureHD is using the purloined information to Guest-Tek's detriment in its Sudbury, Massachusetts office.

9.    Pursuant to 28 U.S.C. § 1391, this Court is a proper venue for this Action.

## FACTUAL ALLEGATIONS
### Guest-Tek's Industry and Competition

10.    Guest-Tek markets broadband high speed Internet access, Voice over internet protocol ("VoIP"), cable television signal and video on demand ("VOD") services and equipment, principally to the hospitality industry, as well as universities, healthcare institutions, time share units and multiple dwelling units.  In sum, Guest-Tek provide the telephone, internet and television service to hotels and other facilities in Canada (Guest-Tek Ltd.) and the United States (Guest-Tek, Inc.).

11.    The provision of high speed Internet access, television, VOD and VoIP is a highly competitive business.  Guest-Tek regularly competes with a number of well-capitalized and established providers to obtain contracts with established and newly developed hotel properties.  One of Guest-Tek's major competitors is SolutionInc Limited ("SolutionInc").

12.    The development and enhancement of its product offerings, marketing and sales leads, pricing structures and responses to hoteliers requests for proposals are critical factors in ensuring Guest-Tek's ability to retain existing customers and develop new relationships.  As described below, Guest-Tek considers this information confidential and proprietary and treat it accordingly.

13.     According to its website, PureHD is a hospitality technology corporation established to provide comprehensive high-definition entertainment solutions to hotels in North America.  PureHD provides high-definition "free-to-guest" ("FTG") television programming with high definition ("HD") solutions.  PureHD also markets a mixed digital standard definition/high definition product, which program, as detailed below, was developed by Guest-Tek at Pullen's insistence shortly before his departure.  PureHD provides services throughout the United States and boasts "cable partnerships in Canada" for delivery of services throughout all of Canada's provinces.  PureHD is a direct competitor of Guest-Tek.

### Pullen's Employment at Guest-Tek

14.     On January 6, 2005, Pullen entered into a subcontractor agreement with Guest-Tek, Inc.  As an independent contractor of Guest-Tek, Inc., Pullen was responsible for "cultivat[ing] and transfer[ing] digital video-on-demand ("DVOD") sales and business relationships with large hotel corporate accounts."  He was also responsible for identifying key strategic hospitality channel partners both globally and domestically for licensing Guest-Tek's products.  Pullen also worked with Guest-Tek's marketing group and developed a strategic product development roadmap.

15.     Pullen's employment with Guest-Tek, Inc. began on February 1, 2006, as Vice President Video On Demand Sales.  Pullen's initial compensation consisted of a base salary of $125,000 plus commissions.  Pullen's total compensation in 2006 was $235,562.97.  On or about July 4, 2007, Pullen was promoted to Vice-President of North American Sales, in which position he remained until he voluntarily and abruptly resigned on May 3, 2009.  Pullen's total compensation was $219,946.98 in 2007 and $258,863.44 in 2008.

16.     Pullen was involved in all aspects of Guest-Tek's sales and marketing efforts.  In fact, on the PureHD website, Pullen describes his role at Guest-Tek as follows:

Tom formerly was the vice-president of North American sales at
Guest-Tek. He managed a team of staff of 19 sales executives,
engineers and support staff and participates [sic] in the video
technology development strategy, Hollywood studio relationships,
as well as, internet product strategy. Under Tom's direction,
Guest-Tek has exceeds [sic] sales targets consistently and has
taken a global technology and mind-share lead in the converged
solutions of video, voice and data for the hospitality market.

17.    Pullen was in a position of trust and confidence at Guest-Tek. Pullen had access

to the confidential and proprietary information and trade secrets of Guest-Tek. Among other

things, Pullen had access to Guest-Tek's customer account information, pricing, terms, customer

preferences, customer lists and contact information, internal financial information, financial

information of customers, marketing plans and strategies, business plans, quotations, pending

proposals, contract documents, technical capabilities and the overall performance of the

company.

**Guest-Tek Protected its Confidential Information and Trade Secrets and Pullen Was
Aware of Guest-Tek's Prohibitions Against Misappropriating its Confidential Information**

18.    Guest-Tek takes substantial and reasonable measures to protect its confidential

information and trade secrets. Guest-Tek utilizes non-disclosure agreements, computer

passwords, designates documents as confidential, utilizes appropriate policies and restricts access

to its network with passwords and other means.

19.    Guest-Tek's network is secured behind a firewall, which is not accessible from

outside of the Company. Guest-Tek employs the use of a Virtual Private Network ("VPN") client

which allows remote users to access the corporate network and associated files and emails via a

secure VPN tunnel. The VPN tunnel is secured using a built in encryption token, which securely

encrypts all traffic to and from the corporate network and the client computer. The VPN tunnel is

also secured via Active Directory network username and password. Only authorized users with

the appropriate permission are able to use the VPN client, and this information would have to be

known by the user before a secure connection can be made.  Guest-Tek does not allow the use of

unsecured wireless access anywhere on the corporate network including satellite offices.  Guest-

Tek's Information Technology department performs frequent searches for rogue connections to

the network using a variety of wireless monitoring tools.  Network, server and user access logs

are reviewed on a monthly basis without exception. Yearly audits performed by outside agencies

are conducted to ensure that legal security requirements are met.

      20.     With respect to its electronic mail system ("Email"), Email servers are secured

behind the corporate firewall, and are not accessible from outside unless a client computer is

connected using a VPN connection (as discussed in the preceding paragraph).  Under no

circumstances are outside mail programs permitted to route or download email from the

corporate Exchange server.  Email access is secured via network login name and password; only

authenticated users are able to connect and download corporate email.  All network user

passwords are required to be changed every 90 days, without exception.  Email access is

permitted publicly through a web interface only.  The web interface is secured over Secure

Socket Layer and is password protected.  Only authenticated users are permitted to access the

web client and can only be accessed if the account is not disabled or otherwise locked out.

      21.     Corporate file share access is restricted to authenticated users only and is behind

the corporate firewall. Authenticated users are only able to access directories and files specified

for that user account. NTFS security permissions do not allow users to read, write or modify files

which are not specifically provisioned to them. Department managers are responsible for

determining which users are allowed access to their respective folders.  Documents which are

considered sensitive are often password protected; however this is at the discretion of the user

and is not done automatically for them.

22.    The SQL database, which houses sales and financial information, is secured using the corporate network user name and password.  Privileges and access rights are granted on a user by user basis and are disabled once the network user account is disabled.  The SQL database is also behind the corporate firewall, which is only accessible from outside of the corporate office via VPN.

23.    From the commencement of his engagement with Guest-Tek, Pullen was aware of the importance Guest-Tek placed on maintaining its confidential and proprietary information and trade secrets.  As previously stated, prior to receiving an offer of employment on January 19, 2006, Pullen worked for Guest-Tek, Inc. as an independent contractor.  Pullen's subcontractor agreement provided that Pullen agreed "to hold and maintain all Confidential Information in trust and confidence for [Guest-Tek] and not to use Confidential Information other than for the benefit of Guest-Tek."  Accordingly, from the outset of his relationship with Guest-Tek, Pullen was aware of the importance of preserving Guest-Tek's confidential information and trade secrets.

24.    Reiterating its commitment to protect its confidential and proprietary information and trade secrets, Guest-Tek, Inc.'s January 19, 2006 offer of employment was conditioned on Pullen's execution of Guest-Tek's Nondisclosure, Nonsolicitation and Assignment of Inventions Agreement.  ("NDA").  Pullen's offer letter explicitly stated that "[t]he Nondisclosure, Nonsolicitation and Assignment of Inventions Agreement is a legal document and must be signed and received for this offer to be valid."

25.    Pullen did not accept the original offer of employment because of issues concerning the compensation package, which issues were subsequently resolved.  Despite the fact that Guest-Tek never waived the condition, Pullen never signed the NDA, and he never

informed Guest-Tek that he refused to sign the NDA.  Guest-Tek was unaware during the entire

period of Pullen's employment that he had failed to sign the NDA.

26.    Guest-Tek requires its employees to sign the NDA, which also includes a

confidentiality provision and non-solicitation agreement, as a means of protecting its trade

secrets and confidential proprietary information.

27.    The NDA provides, in part:

> I acknowledge that during my employment with the Company, I
> am and will continue to be exposed to confidential information and
> trade secrets of both the Company and its clients, all of which are
> essential to the Company's business and the continued
> confidentiality of which is critical to the Company's economic
> well-being.  Such confidential information and trade secrets
> include, but are not limited to: financial information, business
> plans, prospects, inside information (including information
> regarding financial performance, earnings, existing products,
> existing techniques, new products, new techniques and business
> strategies), proprietary processes and know-how, client lists,
> personnel information (including, without limitation, skills and
> compensation), product development information, and information
> regarding possible acquisitions or sales of businesses, products,
> intellectual property or facilities.  Such confidential information
> does not include any information that has become part of the
> public domain by means other than my breach of this Agreement.
> I agree not to use or disclose, at any time during my employment
> or at any time thereafter, any such confidential or trade secret
> information to any third party for any reason, except authorized to
> perform my job.

28.    Guest-Tek's Employee Handbook further provides:

> Protecting our company's information is the responsibility of every
> employee, and we all share a common interest in making sure it is
> not improperly or accidentally disclosed.  Do not discuss the
> company's confidential business with anyone who does not work
> for us.

29.    Part and parcel of its efforts to protect its confidential information, Guest-Tek has

a separate Information Systems Acceptable Use Policy ("Policy"), which was maintained on

Guest-Tek's intranet.  Moreover, it was periodically distributed to employees, including Pullen,

most recently on January 30, 2008.

30.     The Policy expressly requires employees to protect their passwords and requires

that passwords should be changed "frequently."

31.     In addition to these measures, Guest-Tek frequently designates documents as

"confidential."  Similarly, many of the marketing and/or sales documents state:

> The information provided by Guest-Tek is of a proprietary nature
> to Guest-Tek.  This document is not to be reproduced or disclosed
> to any other parties without prior written consent of Guest-Tek.
> By receiving this document, you agree to keep all information
> contained herein confidential and to protect all such information, in
> whole or in part, from disclosure and dissemination to any third
> party.  Guest-Tek must be advised of any request for disclosure by
> a third party or of any order for disclosure by any court, regulatory
> authority, or governmental agency.

**Pullen Unlawfully Took Guest-Tek's Confidential and Proprietary Information On
Various Removable USB Drives**

32.     As Vice-President of North American Sales, Pullen was in a position of trust and

confidence at Guest-Tek and he owed a fiduciary obligation to act in the best interests of Guest-

Tek at all times during his employment.  Pullen breached his fiduciary obligations by engaging

in a well planned and concerted effort to misappropriate Guest-Tek's confidential information,

and by communicating with its competitor for the purpose of establishing a competing company

and engaging in competition with Guest-Tek.

33.     Upon information and belief, beginning in August 2008, Pullen began to take

active steps to misappropriate Guest-Tek's confidential and proprietary information and trade

secrets in order to launch his own enterprise to compete with Guest-Tek.  A forensic examination

of Pullen's laptop computer reveals that on August 21, 2008, almost nine (9) months prior to his

abrupt resignation, Pullen began placing confidential and proprietary information on a USB drive

under a directory named "NewCo", which transparently refers to his "new company." Pullen misappropriated this information in order to unfairly compete with Guest-Tek.

34.    With the assistance of a computer forensic expert, Guest-Tek has learned that Pullen downloaded at least forty-seven (47) Guest-Tek files to one or more different USB drives, some of which he named "TOMSUSB." External USB storage devices are often used to temporarily store and transport data/files between computers.

35.    The forensic review of Pullen's laptop computer reveals that a total of 11 unique USB storage devices had been inserted into Pullen's laptop. Several of the USB storage devices had the capacity to store all of the contents of Pullen's Outlook inbox, calendar and contacts.

36.    Notably, Pullen established a directory on the USB drive or drives called "NewCo." The "NewCo" directory contained the following sub files: "NewCo/sales," "NewCo/marketing," "NewCo/HR" and "NewCo/SolutionInc." The "NewCo/SolutionInc" subfile is particularly troubling because SolutionInc is one of Guest-Tek's biggest competitors. It is clear from the forensic evidence that Pullen was in regular contact with employees of SolutionInc regarding PureHD before resigning from Guest-Tek. Pullen accessed Guest-Tek's confidential and proprietary information and trade secrets on his personal USB drives right up to the time he gave his notice of resignation. Upon information and belief, the information downloaded into his personal USB drive was part of his effort to establish a competing "new company."

37.    Guest-Tek never issued Pullen a single USB drive and there was no need for him to use such a drive as he was remotely connected to Guest-Tek's servers.

38.    The forensic examination of Pullen's laptop reveals a list of "shortcut files" pointing to documents located on an external USB storage device named "TOMSUSB." These

shortcut files are evidence that the files indicated were present on the storage drive named "TOMSUSB" and had been opened or viewed.

39.    Given that the forensic examination is ongoing, it is impossible to identify at this time all the information Pullen copied to his USB drives.  However, a few examples will highlight the sensitivity of the information.  By way of example only, in April 2009, Guest-Tek was solicited to prepare a response to a multi-stage Request For Information from the Hyatt Company ("Hyatt RFI").  Although the Hyatt RFI was for a single hotel 127 room property, the information submitted was to be used by Hyatt in choosing vendors for the rest of their hotels across the country.

40.    Guest-Tek was asked to submit a response to the Hyatt RFI because of its relationship with Hyatt, its goodwill, its product offerings and its technical capabilities and expertise.  The Hyatt RFI was not a published document and was not publicly available.  Having submitted an initial response, Guest-Tek was then invited by Hyatt to submit additional pricing information for Hyatt's "Select Brand."  The request for additional information for the Hyatt RFI was sent by Hyatt to Guest-Tek by email on April 28, 2009, with an attached Excel spreadsheet file to be filled out and submitted by Guest-Tek.  This Excel file was titled "Multi-Vendor IP TV Pricing 4-27-09.xls."  At this stage of the Hyatt RFI, Hyatt requested a quote for a "127 room hotel installation with FTG, VoID, IPTV based on 33-channel lineup."  Hyatt's specific selection of the High and Standard Definition channels to be included is identified in this spreadsheet. The second stage Hyatt RFI requests itemization on a number of "one time fees," such as hardware and installation costs, as well as ongoing "Monthly Fees."

41.    Having possession of the second stage Hyatt RFI spreadsheet would provide a Guest-Tek competitor with significant benefit in marketing competitive services to Hyatt

because the spreadsheet file provides a detailed roadmap of the products and services that Hyatt has determined to proceed with.

42.    Guest-Tek received the Second Stage Hyatt RFI request and "Multi-Vendor IP TV Pricing 4-27-09.xls" file on April 28, 2009.  This file was not a published document and was not publicly available.  Forensic investigation of Pullen's laptop reveals that just two (2) days later, on April 30, 2009, a file was created on a USB device connected to Pullen's laptop and labeled "TOMSUSB" by the name of "Hyatt Multi-Vendor_IP_TV_Pricing_4-27-09.xls."  This file was placed in a directory labeled "Newco/Sales."

43.    Guest-Tek believes that the file that was created on "TOMSUSB" is in fact the second stage Hyatt RFI spreadsheet, and that Pullen and PureHD are in possession of this document for the purpose of using it to compete with Guest-Tek on future business with Hyatt.

44.    By way of further example, other files on Pullen's USB drive in the "NewCo" directory are titled "Sales Presentation draft 5-1-09.ppt" and "Sales_Presentation_draft_5-1-09_v1[1].ppt."  The "Sales Presentation" file, which was recovered from Pullen's laptop computer, is a Power Point presentation for PureHD, created using Guest-Tek's software license and copied from Pullen's Guest-Tek computer to his USB drive on May 1, 2009, when he was employed by Guest-Tek.  A forensic examination of the metadata pertaining to "Sales Presentation draft 5-1-09.ppt" lists the author as "wfrisch" and the company as "Guest-Tek." These two attributes pertain to the Microsoft Office license used to create the document. "Wfrisch" refers to Wayne Frisch, who was formerly employed by Guest-Tek as its Marketing Manager.  Furthermore, the metadata indicates that the document was last saved by someone named "Christopher Holman."  Upon information and belief, Pullen, through PureHD, used

Guest-Tek's computer and licensed software to create marketing materials for a competing enterprise in violation of his fiduciary duties to Guest-Tek.

45.    Also by way of example, in or about December 2008, Guest-Tek received a Request for Proposal from The Archon Hospitality Group ("Archon RFP").  The Archon RFP sought proposals for, among other things, FTG delivery, Pay-Per-View delivery and Project Management for a project involving 290 hotel properties owned and/or managed by The Archon Hospitality Group.  Guest-Tek was selected to submit a RFP because of its relationship with Archon, its goodwill, its product offerings and its technical capabilities and expertise.

46.    The Archon RFP received by Guest-Tek consisted of two documents: a Word document entitled "Archon Hospitality Project Rabbit Ears RFP.doc" describing Archon Hospitality Group and the scope of the project; and, second, an Excel spreadsheet file entitled "Rabbit Ears Master.xls", which file lists 247 hotel properties by address, phone number, general manager name and contact information, together with detailed specifications for each property, including current FTG vendor, comments on existing FTG contract status and total number of tv's in the property.  The Archon RFP documents were not published documents and were not publicly available.

47.    Having possession of the Archon RFP Word document and the detailed spreadsheet provides Guest-Tek with a competitive advantage in its efforts to respond to the RFP and to continue to market its products and services to these properties after and separate and apart from the RFP.  Similarly, having possession of this detailed spreadsheet would provide a Guest-Tek competitor with significant benefit in marketing competitive services to the hotel properties and owners identified in the spreadsheet.

48.     Pullen was provided with access to the Archon RFP documents in his capacity as Vice President of North American Sales for Guest-Tek, and he played a substantial role in Guest-Tek's submission to the Archon RFP.

49.     Guest-Tek's forensic review of Pullen's computer reveals that on January 21, 2009, a file entitled "Archon Rabbit Ears Master.xls" was moved to a directory named "Newco/sales" on TOMSUSB drive, and that this file was accessed on the TOMSUSB drive as recently as April 30, 2009. On information and belief, the file that was placed on TOMSUSB drive is the spreadsheet file part of the Archon RFP that was provided by Archon to Guest-Tek.

50.     Guest-Tek's forensic review of Pullen's computer also identified a file fragment indicating that a file entitled "Archon Hospitality Project Rabbit Ears RFP.doc" was placed on the TOMSUSB drive in a folder entitled "Newco\sales."

51.     Guest-Tek believes that the "Archon Rabbit Ears Master.xls" file and "Archon Hospitality Project Rabbit Ears RFP.doc" file that were created on "TOMSUSB" are in fact the Archon RFP documents, and that Pullen and PureHD are in possession of this document and are using it to compete with Guest-Tek on future business with Archon.

**Knowing He was Planning on Setting Up a Competing Entity, Defendant Pullen Has Left Evidence Indicating he Copied His Outlook "Inbox," "Calendar" and "Contacts" to a CD on April 1, 2009 and May 2, 2009**

52.     Pullen's breach of his fiduciary duty is not limited to copying files to his USB drives. The forensic examination of Pullen's laptop shows that he made a .pst file of his entire e-mail inbox, contacts and calendar and used a software DVD burning program on April 1, 2009.

53.     A Microsoft .pst file is an archive of Microsoft Outlook data. A .pst file can be created automatically by Microsoft Outlook but also manually by the person with access to the Outlook mailbox. Automatically created .pst files usually contain a full replica of the mailbox, calendar, address book, etc. Manually created .pst files can be created by exporting selected

pieces of the mailbox. The forensic examination reveals several indications of manually created .pst backup files. The names of the .pst files indicate that they contain Microsoft Outlook contents pertaining to Pullen's inbox, contacts and calendar. The examination reveals indications that .pst backup files were made as far back as January 2009. There is also evidence suggesting that the .pst files may have been burned onto a DVD disc.

54.     Specifically, the forensic examination reveals a project file pertaining to a CD/DVD burning software program called "Roxio." The Roxio project file indicates that on April 1, 2009, the Roxio software program was used to either create or save a project containing three .pst backup files for the Microsoft Outlook inbox, contacts and calendar from Pullen's computer as well as a folder called "E:\NewCo." The "E:\NewCo" entry is a reference to a folder called "NewCo" on a storage device assigned to drive letter "E" on Pullen's laptop. Based on the forensic examination, drive letter "E" was assigned to an external USB device on Pullen's laptop. Notably, the .pst backup files for April 2009 listed in the Roxio project could not be located on Pullen's laptop.

55.     A Roxio project file is intentionally created by the user either before or after the files have been burned by the Roxio software onto a CD or DVD. Typically, a user adds data to be burned in the Roxio software, burns the data to a CD or DVD and is then prompted after the burning process has finished as to whether or not they want to save the project. If the user does not want to save the project, Roxio will not record any session information.

56.     The existence of the Roxio project file on Pullen's computer is clear evidence that he most likely burned the April 1, 2009 .pst files to disc.

57.     In addition to the April 1, 2009 .pst files, the forensic examination reveals the existence of .pst backup files, which had a creation date of May 2, 2009, one day before Pullen

resigned.  The .pst backup files appeared to be for the inbox, contacts and calendar from Pullen's laptop.

58.    Forensic examination of Pullen's computer does not reveal the existence of a Roxio burning project for the May 2, 2009 .pst files.  However, there would be no record of the burning of the May 2, 2009 .pst files on his computer if Pullen did not create a "project" for this burn.

59.    Guest-Tek believes and therefore asserts that Pullen created the May 2, 2009 .pst files for the sole purpose of burning or copying them to some external media for the purpose of retaining the information.  Certainly, when he created the .pst files on May 2, 2009, Pullen knew he was going to resign within 24 hours.  Pullen had no legitimate business reason to create the .pst files of his Outlook inbox, contacts and calendar where he knew he was resigning immediately thereafter.  Moreover, Pullen had a VPN connection to Guest-Tek's servers where his Outlook data was stored, so there was no need to make independent personal copies of the information unless he intended on using that information for his personal benefit, (*i.e.* for PureHD).

60.    The May 2, 2009 inbox alone included literally thousands of Guest-Tek emails and attachments containing confidential and proprietary information and trade secrets.

61.    An examination of the May 2, 2009 .pst files has just commenced, and it is impossible to overstate the amount of confidential and proprietary information and trade secrets contained in his Outlook inbox.  However, by way of example, confidential and proprietary nature of the information contained in the .pst inbox file is indicated by the following names of Pullen's folders in his inbox: "Administration," "Business Development," "Finance," "Human Resources," "Legal," "Marketing," "Operations," "Research and Development" and "Sales."

Again, by way of example to show the volume of confidential Guest-Tek material that Pullen misappropriated, the "Research and Development" file alone contains thirty-five (35) sub files. His "Sales" folder contains approximately 87 subfolders of hospitality companies such as Archon, Hilton, Hyatt, Marriott, etc. These folders include such Guest-Tek confidential information as its pricing information and confidential responses to various hotel RFP's.  Pullen also had responsibility for sales and business development in Canada, where he managed a sales team.  Under the "Business Development" folder of his inbox, Pullen has separate folders set up for such Canadian companies as Rogers Cable and Shaw Cable, which folders include confidential business information concerning Guest-Tek's contract negotiations and relationships with those two cable companies and hotel properties serviced by those cable companies.

62.    The foregoing information found in the May 2, 2009 .pst files is precisely the type of information that Guest-Tek (or any company, in any industry) would not want its competitors to possess.  However, because of the fact that Pullen misappropriated this information upon information and belief and breached his fiduciary duties, he now has all of Guest-Tek's most sensitive information as the President and founder of PureHD.

63.    The information contained in the .pst file covers all aspects of Guest-Tek's business.  For example, a review of Pullen's "Sales/Archon" mail folder reveals that Pullen was involved with a team of Guest-Tek employees in the preparation of Guest-Tek's response to the Archon RFP.  In preparing its response, Guest-Tek utilized relationships with vendors and leasing partners.  Moreover, Guest-Tek utilized unique financial models and financing arrangements.  The .pst file of Pullen's Outlook inbox now believed to be in his possession includes Guest-Tek's pricing response to Archon's RFP.  This is highly confidential and

proprietary information and all information Pullen, President and founder of PureHD, now possesses.

64.    Another example includes a March 26, 2009 email and attached quote for the Waikoloa Beach Marriott Resort.  This confidential Guest-Tek quote, including the services offered, the technology used, technical requirements and price for the project, is located in Pullen's Inbox .pst file and Guest-Tek believes that Pullen remains in possession of this confidential document.

65.    Pullen also was privy to a highly sensitive confidential and proprietary document which lists all the new hotels in the United States and Canada the Marriott Corporation plans to open in the second half of 2009 ("New Hotel List").  The New Hotel List, obtained by Guest-Tek on a confidential basis, not only lists all the hotels that Marriott plans on opening, but it lists the owner, the manager, the franchisee of the new hotel, the address, the telephone and facsimile numbers.  The New Hotel List is a password protected document.  This is precisely the type of confidential contact information that Guest-Tek and its competitors need to solicit and sell their services to the potential new customers.  Pullen knew the Hotel List was a highly confidential document, and he repeatedly requested that he be given access to it.  The document was emailed to him on April 29, 2009, just days before he resigned.  This document is in the Inbox .pst file Pullen created on May 2, 2009, and Guest-Tek believes and therefore avers that Pullen is in possession of this document and has or will use it to unfairly compete.

66.    The Hyatt RFI, the Archon RFP and Response, the Waikoloa Beach Marriott Resort quote, and the New Hotel List, are just a small sample of the confidential and proprietary information Pullen misappropriated and now possesses.  With this information and the countless other documents like it, Pullen and PureHD have access to Guest-Tek's cost and bidding

structure, specific vendor relationships as well as specific details on a number of projects on

which it will likely bid in the New Hotel List. This is precisely the type of information that is

confidential and proprietary to Guest-Tek and Pullen's misappropriation of this information is a

breach of his fiduciary duty.

67.     Revealing the foregoing information to a competitor is a breach of Pullen's

fiduciary duties.  As Pullen is the founder and President of PureHD, he necessarily has revealed

it to a competitor.

**Pullen Actively Deceived Guest-Tek For Months In Setting Up His New Company While Occupying A Position Of Trust At Guest-Tek.**

68.     As indicated by the creation of his "NewCo" directory in August 2008, Pullen

was planning on creating a competitive entity with Guest-Tek for at least eight (8) months before

his sudden resignation.  Despite these intentions, as Vice-President for North American Sales

Pullen had access to the most sensitive sales, customer, pricing and product development

information and plans.  Pullen actively participated in all aspects of Guest-Tek's business in

order to deceptively acquire as much confidential information as possible and take additional

steps to establish his competing entity including working with a competitor.

69.     Pullen's conduct with regard to the New Hotel List is indicative of his deceptive

conduct.  Pullen aggressively pushed to gain access to the New Hotel List despite the fact that he

did not need access to it.  Reluctantly, Guest-Tek gave Pullen access to the New Hotel List on

April 29, 2009.  Pullen abruptly resigned four days later.

70.     Similarly, an executive meeting took place on February 4-5, 2009 in Calgary.

Pullen pushed hard to attend that meeting.  During the meeting senior executives discussed

Guest-Tek's strategy for success with regards to Sales, Operations and Research &

Development.  The attendees also discussed market trends and budgetary issues.  Pullen attended

this meeting under the guise that he was at Guest-Tek for the long-term. The reality was he absorbed the information discussed while he was setting up a new company and resigned a few months later.

71.     Not only did Pullen deceptively acquire Guest-Tek's confidential and proprietary information, but he pushed Guest-Tek to develop a SD product over coaxial cable, despite the fact that Guest-Tek's Vice President of Marketing did not want to pursue this product line. At Pullen's insistence, however, Guest-Tek expended substantial money and hours of time to develop this program. In fact, at Pullen's urging, Guest-Tek was required to develop a whole new marketing program from scratch and develop both the technical and financial models to offer this product. Armed with this information developed by Guest-Tek, PureHD is now marketing this product offering.

72.     Just a few weeks before his sudden resignation, while in attendance at a Guest-Tek quarterly sales meeting, Pullen was specifically asked if he was planning to leave. Despite the fact that he had been actively engaged in establishing a competing enterprise, Pullen denied that he was leaving.

73.     The major annual conference for the industry is known as HITEC. The HITEC 2009 Conference was recently held on June 22-25, 2009 in Anaheim, California. Guest-Tek had a booth at HITEC. PureHD was also at HITEC, where, upon information and belief, Pullen was demonstrating PureHD's competing products to potential customers.

74.     In a voice mail message to a Guest-Tek employee on July 2, 2009, Pullen stated "I got lots of business coming forward."

**Pullen Worked in Concert with Guest-Tek's Competitor, SolutionInc, While Employed at Guest-Tek to Establish PureHD**

75.    Pullen's conduct is even more egregious because the forensic examination shows that he worked in concert with Guest-Tek's competitor, SolutionInc, in establishing PureHD while employed at Guest-Tek,.

76.    SolutionInc is a Halifax, Nova Scotia, company.  SolutionInc's website asserts that it is an "established global leader in Internet and centralized hotspot connectivity, billing and management solutions.  Since 1997, the company has been providing the hospitality industry with its award-winning SolutionIP™ software and services."  SolutionInc is a major competitor of Guest-Tek.

77.    The forensic examination reveals that before his sudden resignation, Pullen had regular email communications from a personal email account with executives at SolutionInc about starting PureHD.  Specifically, the forensic examination shows numerous emails with Glenn Lavigne, the President, Chief Executive Officer and Director of SolutionInc, Randy Currie, the Chief Technology Officer of SolutionInc and Natalie Oldfield, Chief Marketing Officer of SolutionInc.  The emails pertain to such topics as the PureHD logo, job descriptions and a laptop computer.  These communications occurred all before Pullen resigned and while he was misappropriating Guest-Tek's confidential and proprietary information and trade secrets.

78.    Upon information and belief, Pullen spent significant amounts of time working to establish PureHD while he was employed by Guest-Tek.  Diverting his time and attention from his duties at Guest-Tek is a breach of his fiduciary obligations.

79.    For instance, during the course of his employment and using his Guest-Tek computer, Pullen was working with a designer named Lauren Brown to develop the PureHD logo.

80.    On both April 30, 2009 and May 1, 2009, Pullen notified Guest-Tek in writing that he would not be working those days because he was "down for the count" with what could be "the swine flu."  Copies of Pullen's emails of April 30, 2009 and May 1, 2009 are attached hereto as Exhibit A.  Forensic examination reveals that rather than being home sick, Pullen was actively engaged on those very days in working on behalf of PureHD.  For instance, on information and belief, on April 30, 2009, Pullen was on a plane to Halifax, where he met with Mr. Lavigne of SolutionInc on May 1, 2009.

81.    Forensic examination also reveals that Pullen created the PureHD sales presentation document on May 1, 2009, when he was supposedly too sick to work for Guest-Tek.

82.    Pullen breached his fiduciary duties to Guest-Tek by being actively engaged in the PureHD competitive enterprise while he was still an employee of Guest-Tek, and on days when he informed Guest-Tek that he was too sick to work.

83.    The connection between SolutionInc and PureHD is beyond dispute.  The forensic examination has revealed that while employed by Guest-Tek, Pullen was in negotiations to purchase the purehd.com domain.  When Pullen's negotiations with the owner of the domain name broke down, he sent an email to Glenn Lavigne (CEO of SolutionInc) with a copy to Randy Currie (CTO of SolutionInc) stating, "Looks like we are going without www.purhehd.com due to the insane email below."

84.    The connection between PureHD and SolutionInc is further evidenced by the fact that PureHD Inc. is registered in Nova Scotia.  Its mailing address is 1969 Upper Water Street, Suite 2108, Halifax, NS Canada B3J 3R7.  PureHD Inc. lists Darlene Pinnell as its Director and President/Secretary in Nova Scotia.  Ms. Pinnell is an attorney at JessomeLaw, located at the

same address as PureHD Inc.'s mailing address.  More significantly, SolutionInc's website

identifies JessomeLaw as its legal counsel.

### Pullen Lied to Guest-Tek About What Information He Possessed and Did Not Return All of Guest-Tek's Property in His Possession

85.    Not surprisingly, Pullen's deception toward Guest-Tek continued after he abruptly

left its employment.  By letter dated May 8, 2009, Guest-Tek demanded that Pullen return all of

Guest-Tek's property, including all its confidential and proprietary information and

electronically stored information.  A copy of this letter is attached hereto as Exhibit B.

86.    After several weeks of stalling, on May 27, 2009, Pullen returned his Guest-Tek

laptop computers, some electronic media containing old .pst files and several boxes of

documents.

87.    Significantly, Pullen returned a disc containing a .pst file of Inbox through

December 4, 2007.  He did not return a disc containing the April 1, 2009 .pst files, or the May 2,

.pst files.  He also did not return "TOMSUSB" or any USB drive to which he copied Guest-

Tek's confidential business information.  In other words, he did not return any of the confidential

and proprietary information and trade secrets on the USB drives, the copied cd or the .pst files.

88.    When Guest-Tek requested that Pullen produce his e-mails for the period from

January 2008 through May 2009, Pullen disingenuously responded that he did not possess any

such information.  Moreover, his counsel stated that, "Mr. Pullen did not become associated with

PureHD until he departed from Guest-Tek."  Once again, Pullen blatantly lied to Guest-Tek.

89.    By letter dated June 19, 2009, a copy of which is attached hereto as Exhibit C,

Guest-Tek again demanded that Pullen return the TOMSUSB device and any and all USB

devices that at any time contained Guest-Tek documents or information, or that were connected

at any time to his Guest-Tek laptop, together with all media containing .pst files. To date, Pullen has not responded to this correspondence.

### PureHD Is Falsely Advertising Its Capabilities Vis A Vis Guest-Tek

90.    Guest-Tek and PureHD are direct competitors in the delivery of broadband technology solutions for the hospitality industry. In short, they offer the equivalent of the triple play packages for hotels: telephone, internet and television services for hotel guests. Guest-Tek uses the latest in technology, which means it provides internet through HSIA, telephone services using VoIP technology, and HDTV with a VOD and FTG capability.

91.    Guest-Tek's services, including those offered through Guest-Tek Interactive Entertainment Ltd., have been installed in more than 2,900 properties, including over 35 hotel brands and 40 independent boutique hotels. Guest-Tek Interactive Entertainment Ltd. has a substantial business and derives substantial revenue from its Guest-Tek operations in the United States.

92.    For 2008, Guest-Tek Ltd. generated more than $32 million in revenue from its United States operations. In total, Guest-Tek Ltd.'s revenue from its United States operations accounted for more than 80% of its total revenues in 2008

93.    PureHD is a newly established company that operates and markets its services through website with the domain name "www.purehd.com." The PureHD website is registered to Pullen at 63 Brewster Road, in Sudbury, Massachusetts. The PureHD website is hosted at IP Address 68.178.232.100, which is located in Scottsdale, Arizona. Upon information and belief, GoDaddy.com, Inc. hosts PureHD's website.

94.    PureHD, through its false statements and representations of material fact on its website, is engaging in unfair competition and false advertisements in violation of the Lanham Act, 15 U.S.C. § 1125(a). PureHD's website makes several false and misleading statements of

fact when it describes PureHD as the "only" provider capable of delivering certain services that

Guest-Tek can and does deliver.  PureHD's statements rise about mere puffery because the

statements are specific, measurable and verifiable claims of PureHD's superiority over other

similar vendors, including Guest-Tek, which are false.

95.    Specifically, PureHD makes the following four false assertions of material facts in

advertising on its website:

> ·    PureHD is the only provider today of HDTV services that
> can comprehensively provide remote monitoring of FTG head-
> ends, as well as, remote maintenance to 100% of the HDTV
> channels nearly eliminating truck-roll costs to hotels.
>
> ·    PureHD is the only provider delivering an Electronic
> Program Guide, multiple hotel channels, and a hotel launch page
> that are remotely managed and supported.
>
> ·    PureHD is the only provider who can deliver Dynamic
> Channels On- Demand with "no-truck roll".
>
> ·    PureHD is the only provider that gives hotel "Turn-On"
> channel control back to the property owner.

(Emphasis on PureHD website).  Each of these above statements are false and misleading

because PureHD is not the "only" company able to provide these services.

96.    Pullen knows that Guest-Tek delivers the exact same services which PureHD lists

as being exclusive to PureHD.  Indeed, Pullen himself reviewed, edited and approved the content

of various Guest-Tek advertising materials that clearly and expressly detail Guest-Tek's ability

to provide the exact same services over which Pullen and PureHD now claim exclusive domain.

97.    Specifically, Guest-Tek spent extensive time and effort creating a "Triple Play

Proposal Template" and a "Free to Guest Proposal Template" that were to be used by its

salespeople as a form document which the sales person could use to create a simple, quick, and

accurate presentation of Guest-Tek's services.  The templates would be customized in certain

respects for the customer, but for the most part, they were a ready-made presentation that resulted in consistency in the way Guest-Tek's sales people described their services and capabilities.

98.     Pullen extensively advocated for the creation of the templates. Based on Pullen's position at Guest-Tek and Guest Tek's trust of Pullen, Guest-Tek gave Pullen, amongst others, the ability to review and comment on the content of the templates. More importantly, Guest-Tek insisted that Pullen approve the templates before they were used. Pullen, in fact, approved the content and use of both the "Triple Play Proposal Template" and the "Free to Guest Proposal Template."

99.     After the creation of the templates, Guest-Tek used the templates to generate and spin off other advertising materials which stated the services offered by Guest-Tek. Guest-Tek often solicited Pullen's review, comment and approval on such advertisements. However, because the advertisements were based on the templates approved by Pullen and others, Guest-Tek would not always insist on Pullen's approval as it did for the templates. Nonetheless, Guest-Tek usually received Pullen's approval either in an informal conversation or his silent assent.

100.     As described below, each of the services in which PureHD states that it is the "only" provider capable of delivering is offered by Guest-Tek in fact, confirmed by Guest-Tek's advertising material, and known to Pullen. Indeed, not only does Guest-Tek offer the same services, in many cases the language employed by PureHD and Pullen appears as if it was taken directly from Guest-Tek's advertisements.

101.     PureHD's first false statement of material fact is that it is the "only" provider today of HDTV services that can comprehensively provide remote monitoring of FTG head-

ends, as well as, remote maintenance to 100% of the HDTV channels nearly eliminating truck-roll costs to hotels."

102.    Sophisticated hotelier's know that HD signals are digital and more prone to disruption.  PureHD's advertisement is designed to prey on the fear that its hotel guests will be without television while awaiting a service repair person.  Consequently, PureHD wants to convince the hoteliers that it is the only company that can remotely monitor and fix any distortion or disruption that may occur, without "truck-role", i.e., sending out a service person.

103.    Guest-Tek's Free to Guest Template touts its ability to actively monitor and remotely maintain its channels. Indeed, Guest-Tek states that it provides the option of "remote monitoring" and "remote maintenance" focusing, like PureHD's statement, on the maintenance for "HD-FTG head ends" which "nearly eliminates truck rolls which costs hotels time & material fees from cable companies."

104.    Guest-Tek in fact offers and delivers to its clients remote monitoring of FTG head-ends, as well as remote maintenance to 100% of the HDTV channels, which nearly eliminates truck-roll costs to hotels.  PureHD is not the "only" service provider capable offering these services.

105.    PureHD's second false statement of material fact is that it is "the only provider delivering an Electronic Program Guide, multiple hotel channels, and a hotel launch page that are remotely managed and supported."

106.    An Electronic Program Guide ("EPG") refers to a television screen that lists which networks (ABC, NBC, HBO, etc.) can be found on which channels.  Guest-Tek offers the virtually identical service, only slightly better, called an "Interactive Programming Guide." ("IPG")  The only difference between an EPG and an IPG is that an IPG lets the hotel guest jump

to the channel by clicking on the channel name in the menu screen. This feature is not available on an EPG.

107.    Similarly, Guest-Tek offers its clients multiple hotel channels. As explained in Guest-Tek's "Triple Play Template," Guest-Tek can offer the hotel any number of "In-House Promotional Channels & Information Channels." These channels can be used to advertise the hotel's amenities: e.g., dining, spa, golf, etc., or for any other information that the hotel seeks so these channels can be used as "[p]romotional tool for in-house revenue opportunities."

108.    Lastly, Guest-Tek also offers a hotel launch page. PureHD's use of the term hotel launch page refers to the initial screen which appears when a hotel guest first "turns-on" the television. Two major suppliers and competitors do not allow the hotel to customize the "turn-on" channel or television home page. Hoteliers frequently want customers to be reminded of the hotel when they turn on their television. Instead of a standard menu screen that lists only movie options, a customized hotel launch page may have a picture of the hotel, or emphasize certain luxurious qualities of the hotel or room.

109.    Guest-Tek's Triple Play Template demonstrates that it offers its customers the same service under the feature headings "Hotel Imagery," which shows Guest-Tek's ability to create a "Menu system alignment with the design and décor of the hotel." Guest-Tek also offers "User Interface Customization," which allows the hotel to show its service or deliver a personalized welcome message to the guest. Under the heading "User Interface Customization" of the Triple-Play Template, Guest-Tek notes it's ability to allow the VOD system to "[l]ook and feel aligned to hotel branding and color scheme."

110.    In addition, Guest-Tek can remotely deliver, manage, and support these services. PureHD is not the "only" provider capable of delivering these services remotely because Guest-Tek can also provide these services remotely.

111.    PureHD's third false statement of material fact is that it is the "only provider who can deliver Dynamic Channels On- Demand with 'no-truck roll'."

112.    The term "Dynamic Channels" refers to the ability of a provider to alter the television programming for a particular room or block of rooms based on the occupants.  For example, if an Arab sheik rents the penthouse and a block of rooms at a hotel in New York, he may want to get Arabic channels in his room or the entire block. "Dynamic Channels" represents the ability to filter Arabic channels to the sheik's rooms.  Dynamic Channels with "no-truck roll" refers to the ability to deliver Dynamic Channels without having to send a technician to the hotel.

113.    PureHD's third false statement of material fact is misleading because Guest-Tek can, and does, offer remote delivery of Dynamic Channels on-demand.  In fact, Guest Tek's Free-To-Guest Template, reviewed by and approved by Pullen, specifically states:

> **DYNAMIC CHANNELS**--Today's VIP guests and groups demand hotels to deliver programming in their language or their favorite channels.  Guest-Tek can add or subtract channels on a monthly basis to enable hotels to meet those key guests and group. These additions and subtractions can also be completely remotely, <u>with no truck role</u>.

(Emphasis added on "with no truck role").

114.    Guest-Tek delivers "Dynamic Channels On- Demand with 'no-truck roll'." PureHD is not the only service provider capable of delivering this service.

115.    PureHD's final false statement of material fact is that it is the "only provider that gives hotel 'Turn-On' channel control BACK to the property owner."

30

116.    "Turn-On" channel is the same concept as the hotel's launch page.  As previously discussed, Guest-Tek also can give the hotel control over a "Turn-On" channel or launch page.

117.    Each of PureHD's false statements are directed at important and material issues for hoteliers and is likely to influence their decision in choosing a service provider. For example, three of the statements tout PureHD's ability as the only company able to deliver the services remotely, i.e., without "truck-roll."

118.    Within the hotel service industry, it is not uncommon for hoteliers to have to take rooms offline, thereby losing revenue, in order to provide access to the rooms to their important and necessary vendors.  Because these offline rooms represent lost revenue, hoteliers are particularly enamored with vendors that can deliver their services remotely.  Hoteliers desperately want to limit or eliminate the need to take fully functioning rooms offline for the use of vendors.

119.    The one false statement which is not based on the ability to provide remote service is predicated on the ability to customize the television's home page or "turn-on" channel. Pullen knows that two major suppliers of video services in the hospitality market do not allow the customer to customize the television's home page.  Hoteliers frequently want customers to be reminded of the hotel when they turn on their television.  Guest-Tek provides this service.

120.    While many service providers in the industry are capable of and deliver the same service which PureHD claim only it can deliver, Pullen's conduct is made only all the more egregious by the fact that the PureHD website juxtaposes PureHD's service within pages of touting Pullen's role and experience with Guest-Tek.

121.    Pullen lists himself as the former Vice-President of North American Sales at Guest-Tek, who managed a team of staff of 19 sales executives, engineers and support staff, and

who participated in Guest-Tek's the video technology development and Internet product strategy. Pullen emphasizes the fact that under his direction, Guest-Tek consistently exceeded sales targets and took "global technology and mind-share lead in the converged solutions of video, voice, and data for the hospitality market."

122.    As the former Vice-President of North American Sales for Guest-Tek responsible for its tremendous growth, clients of both Guest-Tek and PureHD would expect that Pullen understands both Guest-Tek's service capabilities and limitations.  Consequently, when determining which service provider to choose, a client is likely to believe Pullen's and PureHD's representations about PureHD's service and capabilities as compared to Guest-Tek, his former employer.

## COUNT I
### (Violations of the Lanham Act vs. PureHD)

123.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

124.    PureHD made false or misleading descriptions of fact and representations of fact on its website about its own abilities and about Guest-Tek's abilities when it listed itself as the "only" provider capable of delivering the services described above.

125.    PureHD's false and misleading statements about it being the "only" provider capable of delivering the services described above is material to consumers of video technology services in the hospitality industry and is likely to influence their purchasing decisions.

126.    PureHD's statements are literally false and actually deceive or have the tendency to deceive a substantial segment of the hospitality industry.

127.    PureHD placed the false or misleading statement in interstate commerce when it published the false statements on its website.  In addition, upon information and belief, PureHD

made similar misstatements and representations in printed advertising material distributed at a recent convention in California.

128.    Guest-Tek has been injured or is likely to be injured as a result of the misrepresentations described above, either by direct diversion of sales or by a lessening of goodwill associated with its products.

**COUNT II**
**(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* v. Pullen)**

129.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

130.    Pullen's Guest-Tek laptop computer was a "protected computer" within the meaning of the Computer Fraud and Abuse Act. Pullen worked out of his home office in Sudbury, Massachusetts. Pullen regularly used his laptop computer to communicate with Guest-Tek personnel, customers, vendors and other employees throughout the United States. Further, Pullen used his laptop computer to access Guest-Tek's servers and databases stored in Calgary, Canada. Pullen used his computer in or affecting interstate and foreign commerce.

131.    Pullen intentionally accessed his computer and Guest-Tek's servers and databases in Canada regularly to download and misappropriate confidential and proprietary information that was without his authorization and or exceeded his authorization. Additionally, through his Guest-Tek computer, he communicated regularly with Guest-Tek's competitor, SolutionInc., to establish a competing entity. Finally, he used his Guest-Tek's computer to establish a competing entity, PureHD. Pullen's conduct constitutes a breach of his fiduciary duty, thus he did not have authorization or exceeded his authorization in such use of Guest-Tek's computer.

132.    Pullen's intentional and unlawful conduct caused damage and losses in excess of $5,000. Specifically, Guest-Tek's damages include, but are not limited to, the fact that Guest-

Tek has been forced to hire a forensic expert to assess the scope of damage and loss caused by Pullen's conduct and has lost many many hours away from day-to-day responsibilities causing losses well in excess of $5,000.

**COUNT III**
**(Misappropriation of Trade Secrets in Violation of M.G.L. c. 93, §§ 42 and 42A v. Defendants)**

133.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

134.    M.G.L. c. 93, § 42 provides, *inter alia*, that whoever steals, unlawfully takes, copies by fraud or deception obtains, from any person or corporation, with intent to convert to his own use, a trade secret, regardless of value shall be liable in tort to said corporation or individual for damages in an amount up to double those found.  The statute defines a "trade secret" as including, but not limited to, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records secret merchandising or management information, procedure or improvement.

135.    Pullen has a statutory duty not to disclose to third parties any confidential information and trade secrets obtained during the course of his employment and he has a legal duty not to convert trade secrets of Guest-Tek to his benefit or the benefit of PureHD.  Pullen has stolen, unlawfully taken, concealed, and/or copied Guest-Tek's trade secrets and confidential and proprietary information by fraud or deception with intent to convert it to its own use and the use of PureHD.

136.    Guest-Tek took reasonable steps to safeguard the secrecy of its trade secrets or confidential information.

137.    In misappropriating the confidential and proprietary information and trade secrets, Pullen and PureHD acted in willfully and in bad faith.

34

138.    Pullen's disclosure to PureHD and Pullen and PureHD's use of Guest-Tek's confidential and proprietary information and trade secrets will give Pullen and PureHD an unfair competitive advantage over Guest-Tek.  Upon information and belief, Defendants have used Guest-Tek's confidential information and trade secrets to harm Guest-Tek.

139.    Notwithstanding Pullen's duty to preserve the confidentiality of the confidential and proprietary information described above, Pullen will, unless enjoined, continue to use misappropriated confidential information and trade secrets from Guest-Tek for the benefit of PureHD in violation of G.L. c. 93.

140.    In light of the highly competitive nature of this industry, absent injunctive relief, including an immediate order to return all confidential information, Guest-Tek will suffer severe and irreparable injury as a result of Pullen and PureHD's use of Guest-Tek's confidential and proprietary information and trade secrets for the benefit of PureHD.

141.    Accordingly, a preliminary and permanent injunction enjoining Pullen and PureHD from retaining the misappropriated information and from using or disclosing the information is the only remedy that will afford Guest-Tek meaningful relief.

142.    As a result of Pullen's conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be awarded by a jury at trial, which amount should be doubled in the discretion of the Court.

## COUNT IV
## (Breach of Duty Loyalty: Guest-Tek, Inc. v. Pullen)

143.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

144.    As a trusted employee, privy to Guest-Tek's trade secrets and confidential information, Pullen owed Guest-Tek a duty of loyalty.  This ongoing duty requires Pullen to act

in the best interests of Guest-Tek. Under the circumstances of this case and described above, Pullen was prohibited from, among other things. misappropriating confidential information and trade secrets, disclosing the information, using Guest-Tek's property to establish a competing entity and continuing to receive pay from Guest-Tek while he spent time creating a competing entity. Pullen's fiduciary duty also prohibits him from working in concert with a competitor to establish a competing entity while still employed at Guest-Tek..

145.    By the above described conduct, Pullen breached his duty of loyalty and thereby harmed Guest-Tek.

146.    As a result of Pullen's conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be determined by a jury at trial.

### COUNT V
### (Misrepresentation; Guest-Tek, Inc. v. Pullen)

147.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

148.    Pullen's course of conduct as described herein constitutes a misrepresentation and deception of Guest-Tek. Among other things, Pullen's conduct wherein he remained employed at Guest-Tek and deceptively acted as a loyal employee caused Guest-Tek to sustain significant damage. Pullen repeatedly behaved to Guest-Tek as if he was a loyal employee, including affirmatively stating that he did not intend on leaving Guest-Tek shortly before he resigned, pushing for the development of products seemingly on Guest-Tek's behalf when he knew he was departing so he could use that information for the benefit of PureHD and lying about his ability to work when in fact he was meeting with a competitor to start PureHD were misrepresentations as to material facts about Pullen's employment at Guest-Tek. Pullen additionally deceived Guest-Tek by repeatedly denying that he has any confidential information and trade secrets. At

all times, Pullen knew his statements and conduct were false and engaged in this misconduct to continue to have access to Guest-Tek's confidential and proprietary information, receive compensation when it was not earned and maximize the use of the misappropriated confidential information after his employment terminated..

149.    Guest-Tek justifiably relied on Pullen's material misrepresentations and deceptive conduct that he was a loyal employee and was intending to stay at Guest-Tek in to the future by continuing to compensate him, provide him directly with confidential and proprietary information and trade secrets and provide him access to Guest-Tek's exchange servers, which contained other confidential and proprietary information and trade secrets.

150.    Guest-Tek has been damaged by Pullen's misrepresentations and deceptive conduct and seeks an award of damages in an amount to be determined by a jury at trial.

**COUNT VI**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing: Guest-Tek, Inc. v.**
**Pullen)**

151.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

152.    Implicit in his employment relationship with Guest-Tek, Pullen was obligated to act in good faith and fairly toward Guest-Tek.

153.    Pullen breached the implied covenant of good faith and fair dealing implicit in his employment relationship by the conduct described above.  Pullen's breach includes but is not limited to his misappropriation of confidential and proprietary information and trade secrets, working in concert with a competitor to set up PureHD, lying about being sick and receiving pay from Guest-Tek when he was actually meeting with a competitor and  refusing to return the misappropriated confidential and proprietary information and trade secrets.

## COUNT VII
### (Conversion v. Defendants)

154.    Guest-Tek repeats and reallages each of the preceding allegations as if set forth herein.

155.    PureHD in its corporate capacity, and Pullen in his individual capacity, wrongfully exercised dominion and control over secret business information of Guest-Tek, which all Defendants after demand for turnover of the property, have refused to turnover to Guest-Tek.

156.    As a result of the foregoing Pullen and PureHD are liable for conversion in an amount to be established by a jury at trial.

## COUNT VIII
### (Unjust Enrichment; Guest-Tek, Inc. v. Pullen)

157.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

158.    Guest-Tek conferred a benefit by paying Pullen a salary in return for the services rendered on behalf of Guest-Tek.  As a fiduciary, at all times Pullen was expected to work toward the best interests of Guest-Tek.

159.    Pullen accepted a salary from Guest-Tek throughout his employment.

160.    Pullen however did not work for the best interests of Guest-Tek throughout his employment.  In fact, Pullen misrepresented the state of his health, and expended substantial efforts in establishing a competing enterprise while he was supposed to be working in Guest-Tek's best interests.

## COUNT IX
### (Violation of G.L. c. 93A v. PureHD)

161.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

162.    PureHD is engaged in trade or commerce as defined under G.L. c. 93A.

163.    Guest-Tek is engaged in trade or commerce as defined under G.L. c. 93A.

164.    Pullen took Guest-Tek's trade secrets and confidential and proprietary documents for the benefit of PureHD.

165.    The majority of the conduct alleged took place within Massachusetts as Pullen on behalf of PureHD misappropriated Guest-Tek's trade secrets, proprietary and confidential information in Massachusetts, Pullen transferred that information to PureHD in Massachusetts, and, upon information and belief, PureHD has retained the trade secrets and confidential information at its principal place of business located in Sudbury, Massachusetts.

166.    PureHD's conduct constitutes and unfair and/or deceptive trade practices in violation of G.L. c. 93A, § 11.

167.    Guest-Tek has been damaged by PureHD's conduct in an amount to be determined at trial.

## COUNT X
### (Violation of G.L. c. 93A v. Pullen)

168.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

169.    Pullen is engaged in trade or commerce as defined under G.L. c. 93A.

170.    Guest-Tek is engaged in trade or commerce as defined under G.L. c. 93A.

171.    Pullen's misappropriation of Guest-Tek's confidential and proprietary information and trade secrets, refusal to return the information after multiple requests, working

in concert with a competitor and using the misappropriated and confidential information and trade secrets constitutes an unfair and deceptive trade practice.

172.    The majority of the conduct alleged took place within Massachusetts as Pullen on misappropriated Guest-Tek's trade secrets, proprietary and confidential information in Massachusetts, Pullen transferred that information to PureHD in Massachusetts, and, upon information and belief, PureHD has retained the trade secrets and confidential information at its principal place of business located in Sudbury, Massachusetts.

173.    Pullen's conduct constitutes and unfair and/or deceptive trade practices in violation of G.L. c. 93A § 11.

174.    Guest-Tek has been damaged by PureHD's conduct in an amount to be determined at trial.

**WHEREFORE**, Guest-Tek requests the Court enter the following relief on all counts of the Verified Complaint as appropriate:

1.      A Declaratory Judgment that Defendant Pullen breached his duty of loyalty to Guest-Tek;

2.      A Preliminary Injunction requiring Pullen and PureHD to immediately remove all false statements of fact from any PureHD website and all marketing and advertising materials;

3.      A Permanent Injunction barring Pullen and PureHD from making any false statements of fact as to its capabilities on any PureHD website and all marketing and advertising materials;

4.      A Preliminary Injunction requiring Pullen and PureHD to immediately return to Guest-Tek all USB drives, DVD discs and electronic media to which he copied Guest-Tek information;

5.      A Permanent Injunction requiring Pullen and PureHD to immediately return to Guest-Tek all USB drives, DVDs and electronic media to which he copied Guest-Tek information;

6.      A Preliminary Injunction enjoining Pullen from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD or to any other

competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, or any other competitor of Guest-Tek. Further, Pullen should be ordered to return all of the trade secrets and confidential information in his possession;

7.      A Permanent Injunction enjoining Pullen from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD or to any other competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, or any other competitor of Guest-Tek. Further, Pullen should be ordered to return all of the trade secrets and confidential information in his possession

8.      A Preliminary Injunction enjoining Pullen from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information he misappropriated;

9.      A Permanent Injunction enjoining Pullen from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information he misappropriated;

10.      A Preliminary Injunction enjoining PureHD from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information misappropriated by Pullen;

11.      A Permanent Injunction enjoining PureHD from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information he misappropriated by Pullen;

12.      A Preliminary Injunction enjoining PureHD from retaining, using or transmitting any of Guest-Tek's trade secrets or confidential information. Further, PureHD should be ordered to return all of the trade secrets and confidential information in its possession;

13.      A Permanent Injunction enjoining PureHD from retaining, using or transmitting any of Plaintiff's trade secrets or confidential information. Further, PureHD should be ordered to return all of the trade secrets and confidential information in its possession;

14.      A Preliminary Injunction enjoining PureHD or any of its employees from soliciting any clients of Guest-Tek whom any employee of PureHD became aware by virtue of Pullen's employment at Guest-Tek;

15.      A Permanent Injunction enjoining PureHD or any of its employees from soliciting any clients of Guest-Tek whom any employee of PureHD became aware by virtue of Pullen's employment at Guest-Tek;

16.      A Preliminary Injunction directing Pullen and PureHD to turn over to Guest-Tek for forensic review all computers and removable storage devices in their possession at any time from January 1, 2008 to the present;

17.      An Order that Defendants pay Guest-Tek damages as awarded by a jury at trial or allowed by statute, including double and treble damages and reasonable attorney's fees

and costs in this action together with interest on any monetary judgment plaintiff may obtain; and

18.     Such further relief as the Court deems just.

## JURY DEMAND

Guest-Tek demands a trial by jury on all claims and issues so triable.

GUEST-TEK INTERACTIVE
ENTERTAINMENT, INC. and GUEST-
TEK INTERACTIVE ENTERTAINMENT,
LTD.

By its attorneys,

  /s/ Gary M. Feldman
Gary M. Feldman, BBO #162070
David M. Cogliano, BBO #630185
Christopher J. Marino, BBO #655007
**DAVIS, MALM & D'AGOSTINE, P.C.**
One Boston Place
Boston, MA  02108
(617) 367-2500