EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-CV-11164-NMG

GUEST-TEK INTERACTIVE ENTERTAINMENT
INC., and GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.,

                Plaintiffs,

v.

THOMAS PULLEN, PUREHD INC.,
SOLUTIONINC LIMITED and GLEN LAVIGNE,

                Defendants.

## FIRST AMENDED COMPLAINT AND JURY DEMAND

The plaintiffs, Guest-Tek Interactive Entertainment, Ltd. and Guest-Tek Interactive

Entertainment Inc., by and through their attorneys, complain against the defendants, Thomas

Pullen, PureHD Inc., SolutionInc Limited and Glen Lavigne as follows:

## PARTIES

1.      The plaintiff, Guest-Tek Interactive Entertainment Ltd., is a Canadian corporation

incorporated under the Alberta Business Corporation Act, with a principal place of business

located in Calgary, Canada, and which is publicly traded on the Toronto Stock Exchange.

2.      The plaintiff, Guest-Tek Interactive Entertainment Inc., is a California corporation

with a principal place of business located in Irvine, California.  Guest-Tek Interactive

Entertainment Inc. is a wholly owned subsidiary of Guest-Tek Interactive Entertainment Ltd.

The plaintiffs are collectively referred to herein as "Guest-Tek."

3.      The defendant, Thomas Pullen ("Pullen"), resides in Sudbury, Middlesex County, Commonwealth of Massachusetts.

4.      The defendant, PureHD Inc. ("PureHD"), is a Canadian corporation incorporated under the Nova Scotia Companies Act with, according to its website, a principal place of business located in Sudbury, Commonwealth of Massachusetts.  Pullen is the founder and President of PureHD.

5.      SolutionInc Limited ("SolutionInc") is, upon information and belief, a Canadian corporation incorporated under the Nova Scotia Companies Act with a principal place of business located in Halifax, Nova Scotia, Canada.  SolutionInc is a wholly owned subsidiary of SolutionInc Technologies Limited, a Canadian corporation.

6.      Glen Lavigne is the President, Chief Executive Officer and Director of SolutionInc.  Upon information and belief, Lavigne resides at 18 Lakefield Drive, Mount Uniacke NS B0N 1Z0.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.  The mount in controversy is in excess of $75,000.

8.      This Court has personal jurisdiction over Pullen because he lives in Sudbury, Massachusetts.  Pullen worked for Guest-Tek out of a home office located in Sudbury, Massachusetts and, upon information and belief, it was from the Sudbury location that Pullen misappropriated Guest-Tek's confidential and proprietary information, conspired with SolutionInc and Lavigne, breached his fiduciary duties to Guest-Tek, and established PureHD. Defendants' Sudbury office  is also the location at which Pullen stores, uses and continues to access Guest-Tek's misappropriated information.

9.     This Court has personal jurisdiction over PureHD because PureHD operates from an office in Sudbury, Massachusetts.  Upon information and belief, Guest-Tek's misappropriated information is located in its office in Sudbury, Massachusetts and PureHD is using the purloined information to Guest-Tek's detriment in its Sudbury, Massachusetts office.

10.    This Court has personal jurisdiction over Lavigne because over the course of many months Lavigne regularly, voluntarily and purposefully availed himself of contacts with Massachusetts.  Lavigne communicated with Pullen while Pullen was located in Massachusetts, in furtherance of their conspiracy against Guest-Tek and to aid and abet Pullen in breach of his fiduciary duty and conversion of Guest-Tek's property.  Much of Lavigne's conduct in furtherance of the conspiracy and aiding and abetting Pullen's breach of fiduciary duty and aiding and abetting in the conversion of Guest-Tek's property took place in Massachusetts through email communications and telephone conversations with Pullen when Pullen was in Massachusetts and where the breaches and conversion occurred.

11.    This Court has personal jurisdiction over SolutionInc because over the course of many months SolutionInc, through Lavigne and other employees, regularly, voluntarily and purposefully availed himself of contacts with Massachusetts.  Lavigne communicated with Pullen while Pullen was located in Massachusetts in furtherance of their conspiracy against Guest-Tek and to aid and abet Pullen in his breach of fiduciary duty and conversion of Guest-Tek's property.  Much of SolutionInc's conduct in furtherance of the conspiracy and aiding and abetting Pullen's breach of fiduciary duty and aiding and abetting in the conversion of Guest-Tek's property took place in Massachusetts through email communications and telephone conversations with Pullen when Pullen was in Massachusetts and where the breaches and conversion occurred.

12.     Pursuant to 28 U.S.C. § 1391, this Court is a proper venue for this Action because substantial acts in furtherance of the claims asserted in this case occurred in this District.

## FACTUAL ALLEGATIONS

### Guest-Tek's Industry and Competition

13.     Guest-Tek markets broadband high speed Internet access ("HSIA"), Voice over internet protocol ("VoIP"), cable television signal and video on demand ("VOD") services and equipment, principally to the hospitality industry, as well as universities, healthcare institutions, time share units and multiple dwelling units.  In sum, Guest-Tek provides the telephone, internet and television service to hotels and other facilities in Canada (Guest-Tek Ltd.) and the United States (Guest-Tek, Inc.).

14.     The provision of high speed Internet access, television, VOD and VoIP is a highly competitive business.  Guest-Tek regularly competes with a number of well-capitalized and established providers to obtain contracts with established and newly developed hotel properties. One of Guest-Tek's major competitors in the HSIA and VOD markets is SolutionInc.

15.     The development and enhancement of its product offerings, marketing and sales leads, pricing structures and responses to hoteliers' requests for proposals are critical factors in ensuring Guest-Tek's ability to retain existing customers and develop new relationships.  As described below, Guest-Tek considers this information confidential and proprietary and treat it accordingly.

16.     According to its website, PureHD is a hospitality technology corporation established to provide comprehensive high-definition entertainment solutions to hotels in North America.  PureHD provides high-definition "free-to-guest" ("FTG") television programming with high definition ("HD") solutions.  PureHD also markets a mixed digital standard

definition/high definition product, which program, as detailed below, was developed by Guest-Tek at Pullen's insistence shortly before his departure. PureHD provides services throughout the United States and boasts "cable partnerships in Canada" for delivery of services throughout all of Canada's provinces. PureHD is a direct competitor of Guest-Tek.

17.      Although a competitor of Guest-Tek's in a variety of platforms, SolutionInc did not have a strong presence in the FTG market. SolutionInc has conspired with and partnered with Pullen to misappropriate Guest-Tek's trade secrets, confidential and proprietary information and to use that information to form PureHD. Through the theft of Guest-Tek's information, SolutionInc could enter the FTG market without spending millions of dollars and years in research and development to develop a viable product.

### Pullen's Employment at Guest-Tek

18.      On January 6, 2005, Pullen entered into a subcontractor agreement with Guest-Tek, Inc. As an independent contractor of Guest-Tek, Inc., Pullen was responsible for "cultivat[ing] and transfer[ing] digital video-on-demand ("DVOD") sales and business relationships with large hotel corporate accounts." He was also responsible for identifying key strategic hospitality channel partners both globally and domestically for licensing Guest-Tek's products. Pullen also worked with Guest-Tek's marketing group and developed a strategic product development roadmap.

19.      Pullen's employment with Guest-Tek, Inc. began on February 1, 2006, as Vice President Video On Demand Sales. Pullen's initial compensation consisted of a base salary of $125,000 plus commissions. Pullen's total compensation in 2006 was $235,562.97. On or about July 4, 2007, Pullen was promoted to Vice-President of North American Sales, in which position he remained until he voluntarily and abruptly resigned on May 3, 2009. Pullen's total compensation was $219,946.98 in 2007 and $258,863.44 in 2008.

5

20.     Pullen was involved in all aspects of Guest-Tek's sales and marketing efforts.  In fact, on the PureHD website, Pullen describes his role at Guest-Tek as follows:

> Tom formerly was the vice-president of North American sales at Guest-Tek.  He managed a team of staff of 19 sales executives, engineers and support staff and participates [sic] in the video technology development strategy, Hollywood studio relationships, as well as, internet product strategy.  Under Tom's direction, Guest-Tek has exceeds [sic] sales targets consistently and has taken a global technology and mind-share lead in the converged solutions of video, voice and data for the hospitality market.

21.     Pullen was in a position of trust and confidence at Guest-Tek.  Pullen had access to the confidential and proprietary information and trade secrets of Guest-Tek.  Among other things, Pullen had access to Guest-Tek's customer account information, pricing, terms, customer preferences, customer lists and contact information, internal financial information, financial information of customers, marketing plans and strategies, business plans, quotations, pending proposals, contract documents, technical capabilities and the overall performance of the company.

**Guest-Tek Protected its Confidential Information and Trade Secrets and Pullen Was Aware of Guest-Tek's Prohibitions Against Misappropriating its Confidential Information**

22.     Guest-Tek takes substantial and reasonable measures to protect its confidential information and trade secrets.  Guest-Tek utilizes non-disclosure agreements, computer passwords, designates documents as confidential, utilizes appropriate policies and restricts access to its network with passwords and other means.

23.     Guest-Tek's network is secured behind a firewall, which is not accessible from outside of the Company. Guest-Tek employs the use of a Virtual Private Network ("VPN") client which allows remote users to access the corporate network and associated files and emails via a secure VPN tunnel.  The VPN tunnel is secured using a built in encryption token, which securely encrypts all traffic to and from the corporate network and the client computer. The VPN tunnel is

6

also secured via Active Directory network username and password.  Only authorized users with

the appropriate permission are able to use the VPN client, and this information would have to be

known by the user before a secure connection can be made.  Guest-Tek does not allow the use of

unsecured wireless access anywhere on the corporate network including satellite offices.  Guest-

Tek's Information Technology department performs frequent searches for rogue connections to

the network using a variety of wireless monitoring tools.  Network, server and user access logs

are reviewed on a monthly basis without exception. Yearly audits performed by outside agencies

are conducted to ensure that legal security requirements are met.

24.     With respect to its electronic mail system ("Email"), Email servers are secured

behind the corporate firewall, and are not accessible from outside unless a client computer is

connected using a VPN connection (as discussed in the preceding paragraph).  Under no

circumstances are outside mail programs permitted to route or download email from the

corporate Exchange server.  Email access is secured via network login name and password; only

authenticated users are able to connect and download corporate email.  All network user

passwords are required to be changed every 90 days, without exception.  Email access is

permitted publicly through a web interface only.  The web interface is secured over Secure

Socket Layer and is password protected.  Only authenticated users are permitted to access the

web client and can only be accessed if the account is not disabled or otherwise locked out.

25.     Corporate file share access is restricted to authenticated users only and is behind

the corporate firewall. Authenticated users are only able to access directories and files specified

for that user account. NTFS security permissions do not allow users to read, write or modify files

which are not specifically provisioned to them. Department managers are responsible for

determining which users are allowed access to their respective folders.  Documents which are

considered sensitive are often password protected; however this is at the discretion of the user and is not done automatically for them.

26.     The SQL database, which houses sales and financial information, is secured using the corporate network user name and password.  Privileges and access rights are granted on a user by user basis and are disabled once the network user account is disabled.  The SQL database is also behind the corporate firewall, which is only accessible from outside of the corporate office via VPN.

27.     From the commencement of his engagement with Guest-Tek, Pullen was aware of the importance Guest-Tek placed on maintaining its confidential and proprietary information and trade secrets.  As previously stated, prior to receiving an offer of employment on January 19, 2006, Pullen worked for Guest-Tek, Inc. as an independent contractor.  Pullen's subcontractor agreement provided that Pullen agreed "to hold and maintain all Confidential Information in trust and confidence for [Guest-Tek] and not to use Confidential Information other than for the benefit of Guest-Tek."  Accordingly, from the outset of his relationship with Guest-Tek, Pullen was aware of the importance of preserving Guest-Tek's confidential information and trade secrets.

28.     Reiterating its commitment to protect its confidential and proprietary information and trade secrets, Guest-Tek, Inc.'s January 19, 2006 offer of employment was conditioned on Pullen's execution of Guest-Tek's Nondisclosure, Nonsolicitation and Assignment of Inventions Agreement.  ("NDA").  Pullen's offer letter explicitly stated that "[t]he Nondisclosure, Nonsolicitation and Assignment of Inventions Agreement is a legal document and must be signed and received for this offer to be valid."

29.     Pullen did not accept the original offer of employment because of issues concerning the compensation package, which issues were subsequently resolved.  Despite the

fact that Guest-Tek never waived the condition, Pullen never signed the NDA, and he never informed Guest-Tek that he refused to sign the NDA.  Guest-Tek was unaware during the entire period of Pullen's employment that he had failed to sign the NDA.

30.     Guest-Tek requires its employees to sign the NDA, which also includes a confidentiality provision and non-solicitation agreement, as a means of protecting its trade secrets and confidential proprietary information.

31.     The NDA provides, in part:

> I acknowledge that during my employment with the Company, I am and will continue to be exposed to confidential information and trade secrets of both the Company and its clients, all of which are essential to the Company's business and the continued confidentiality of which is critical to the Company's economic well-being.  Such confidential information and trade secrets include, but are not limited to: financial information, business plans, prospects, inside information (including information regarding financial performance, earnings, existing products, existing techniques, new products, new techniques and business strategies), proprietary processes and know-how, client lists, personnel information (including, without limitation, skills and compensation), product development information, and information regarding possible acquisitions or sales of businesses, products, intellectual property or facilities.  Such confidential information does not include any information that has become part of the public domain by means other than my breach of this Agreement. I agree not to use or disclose, at any time during my employment or at any time thereafter, any such confidential or trade secret information to any third party for any reason, except authorized to perform my job.

32.     Guest-Tek's Employee Handbook further provides:

> Protecting our company's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed.  Do not discuss the company's confidential business with anyone who does not work for us.

33.     Part and parcel of its efforts to protect its confidential information, Guest-Tek has a separate Information Systems Acceptable Use Policy ("Policy"), which was maintained on

Guest-Tek's intranet. Moreover, it was periodically distributed to employees, including Pullen, most recently on January 30, 2008.

34.    The Policy expressly requires employees to protect their passwords and requires that passwords should be changed "frequently."

35.    In addition to these measures, Guest-Tek frequently designates documents as "confidential." Similarly, many of the marketing and/or sales documents state:

> The information provided by Guest-Tek is of a proprietary nature to Guest-Tek. This document is not to be reproduced or disclosed to any other parties without prior written consent of Guest-Tek. By receiving this document, you agree to keep all information contained herein confidential and to protect all such information, in whole or in part, from disclosure and dissemination to any third party. Guest-Tek must be advised of any request for disclosure by a third party or of any order for disclosure by any court, regulatory authority, or governmental agency.

**Defendants Conspired to Misappropriate Guest-Tek's Confidential and Proprietary Information and Form an Entity to Unlawfully Compete with Guest-Tek**

36.    As Vice-President of North American Sales, Pullen was in a position of trust and confidence at Guest-Tek and he owed a fiduciary obligation to act in the best interests of Guest-Tek at all times during his employment. Over a period of many months, Pullen, in concert with the other Defendants, engaged in a concerted course of conduct to misappropriate Guest-Tek's confidential information, trade secrets and business proprietary information, conspire against Guest-Tek, and aid and abet Pullen's breach of fiduciary duty and conversion to establish an entity to unlawfully compete with Guest-Tek.

37.    By August 2008, Pullen began a concerted effort to misappropriate Guest-Tek's confidential information, trade secrets and proprietary business information, to engage in a conspiracy in breach of his fiduciary duties to Guest-Tek to convert Guest-Tek's property including its confidential information, trade secrets and proprietary business information.

38.     To accomplish his plan, at some point Pullen, Lavigne and SolutionInc joined

forces and began planning and implementing a scheme whereby Lavigne and/or SolutionInc

would finance or become otherwise involved in NewCo, which became PureHD.

39.     The forensic evidence and the limited discovery produced to date reveals that

Pullen was communicating and planning NewCo, which became PureHD, with employees of

SolutionInc, including Lavigne, for many months before he resigned from Guest-Tek.   Indeed,

the evidence reveals that while Pullen was employed by Guest-Tek, Pullen transmitted

confidential information to Lavigne and SolutionInc in violation of his fiduciary duty.   As

described below, these documents were not just Guest-Tek's confidential information, they were

critical to giving PureHD a head start in the FTG market.

40.     Before his sudden resignation, Pullen had regular email communications from his

home and/or home office in Massachusetts using a personal email account with executives at

SolutionInc about starting PureHD.   In order to facilitate this conspiracy, Pullen directed those he

was in contact with to only use his personal email account to discuss matters relating to the

formation and business of PureHD.   Specifically, Pullen engaged in frequent email

communications with Lavigne, Randy Currie, the Chief Technology Officer of SolutionInc, and

Natalie Oldfield, Chief Marketing Officer of SolutionInc.   The emails pertain to such topics as

the PureHD logo, job descriptions, business plans, the identity of Guest-Tek employees to hire,

and identification of customers to target.   These communications occurred before Pullen resigned

and while he was simultaneously misappropriating Guest-Tek's confidential and proprietary

information and trade secrets.   Discovery has revealed that Lavigne and SolutionInc were and are

far more involved in PureHD than originally known.   SolutionInc and Lavigne were and

continue to be intimately involved in the formation and operation of PureHD, and received,

discussed and used Guest-Tek's confidential and proprietary information. As part of their involvement, Defendants have conspired against Guest-Tek and aided and abetted in Pullen's breach of fiduciary duty and conversion.

41.     Although SolutionInc was a competitor of Guest-Tek in some platforms, SolutionInc did not have a significant presence in the "Free-to-Guest" ("FTG") market. PureHD promotes itself as selling FTG services to hotels. Lavigne and SolutionInc became involved with Pullen and PureHD, in part, so SolutionInc could penetrate the FTG market. Long before he resigned from Guest-Tek, Pullen described Randy Currie, (CTO of SolutionInc) as "a business partner launching FTG services in hotels, MDU's, hospitals and universities." Also while he was still employed at Guest-Tek, Pullen introduced Currie and SolutionInc as "interested in entering the FTG business for hotels." To achieve that end, Lavigne and SolutionInc agreed to work with Pullen in his scheme to misappropriate Guest-Tek's confidential information, trade secrets and business proprietary information, aid and abet his breach of fiduciary duties and conversion and conspire against Guest-Tek. Defendants are so intertwined that, for example, Lavigne and others at SolutionInc actually work on PureHD's behalf and Lavigne hires employees in the United States on behalf of SolutionInc for PureHD.

42.     One example of this concerted activity relates to Guest-Tek's FTG delivery methodology for providing FTG services, which Pullen misappropriated, disclosed and has used on behalf of Defendants. By misappropriating this confidential information, PureHD, with assistance from Lavigne and SolutionInc, is attempting to penetrate the FTG market without having incurred the costs of developing its own products or delivery solutions. This furthers the aim of Defendants of entering the FTG market with minimal costs and enables PureHD to

unfairly compete with Guest-Tek by unlawfully benefiting from Guest-Tek's research and development efforts.

43.     Over the course of a number of years, Guest-Tek worked with its vendors, DISH Network and VideoPropulsion to set up a workable efficient system of providing FTG services to hotels. As part of this process, Guest-Tek set up a laboratory in Sioux Falls, South Dakota to research and develop this methodology. Guest-Tek spent thousands of dollars and many of hours of labor trying to improve and master the methodology. Lee McKenna was employed by Guest-Tek in Sioux Falls and worked extensively with Guest-Tek's engineers and research and development team to develop this methodology. The methodology developed by Guest-Tek was and is not known to the public. Moreover, there is no way a competitor could replicate the methodology without painfully and expensively enduring the trials and errors experienced by Guest-Tek in developing the delivery system over the two year period.

44.     Lavigne and SolutionInc acted in concert with Pullen's misappropriation of Guest-Tek's FTG delivery methodology. For example, Defendants submitted a proposal for FTG services to the Archon Hospitality Group in which they offered Archon an exact replica of Guest-Tek's FTG delivery method. To that end, Pullen emailed Lavigne, during Guest-Tek business hours from his personal email account, his efforts to recruit and hire Lee McKenna. He also told Lavigne that he had the information regarding the "FTG Installers/Configure guys" and "the costs of the lab in Souix [sic] Falls where racks are assembled so I can drop it into a budget for future positions." He also informed Lavigne and SolutionInc that "floodgates can be arranged for shipping in the next week or two." Defendants misappropriated this methodology as part of their joint scheme to penetrate the FTG market unfairly utilizing Guest-Tek's research and development. Defendants are now offering this FTG delivery methodology to potential

customers as their own.  Upon information and belief, Defendants are offering this FTG delivery method to Guest-Tek's customers as well and presenting it as their own.

**Over a Period of Many Months Pullen Misappropriated Guest-Tek's Confidential and Proprietary Information In Order to Establish Defendants' Competing Entity**

45.     Upon information and belief, beginning in at least August 2008, Pullen began to take active steps to misappropriate Guest-Tek's confidential and proprietary information and trade secrets in order to launch his own enterprise to compete with Guest-Tek.  On August 21, 2008, almost nine (9) months prior to his abrupt resignation, Pullen began placing confidential and proprietary information on a USB drive under a directory named "NewCo", which transparently refers to his "new company."  Pullen misappropriated this information in order to unfairly compete with Guest-Tek.

46.     With the assistance of a computer forensic expert, Guest-Tek has learned that Pullen downloaded at least forty-seven (47) Guest-Tek files to one or more different USB drives, some of which he named "TOMSUSB."

47.     Notably, Pullen established a directory on the USB drive or drives called "NewCo."  The "NewCo" directory contained the following sub files: "NewCo/sales," "NewCo/marketing," "NewCo/HR" and "NewCo/SolutionInc."

48.     Pullen accessed Guest-Tek's confidential and proprietary information and trade secrets on his personal USB drives right up to the time he gave his notice of resignation.  The information downloaded into his personal USB drive and the information disclosed to Lavigne and SolutionInc was part of their plan to establish a competing "NewCo".  Moreover, Pullen has accessed, viewed and used Guest-Tek confidential information, trade secrets and business proprietary information since leaving Guest-Tek while employed by PureHD and working with Defendants.

14

49.     Given that the forensic examination and discovery is ongoing, it is impossible to identify at this time all the information Pullen copied to his PureHD computers and electronic data devices.  However, a few examples will highlight the sensitivity of the information.  By way of example only, in April 2009, Guest-Tek was solicited to prepare a response to a multi-stage Request For Information from the Hyatt Company ("Hyatt RFI").  Although the Hyatt RFI was for a single hotel 127 room property, the information submitted was to be used by Hyatt in choosing vendors for the rest of their hotels across the country.

50.     Guest-Tek was asked to submit a response to the Hyatt RFI because of its relationship with Hyatt, its goodwill, its product offerings and its technical capabilities and expertise.  The Hyatt RFI was not a published document and was not publicly available.  Having submitted an initial response, Guest-Tek was then invited by Hyatt to submit additional pricing information for Hyatt's "Select Brand."  The request for additional information for the Hyatt RFI was sent by Hyatt to Guest-Tek by email on April 28, 2009, with an attached Excel spreadsheet file to be filled out and submitted by Guest-Tek.  This Excel file was titled "Multi-Vendor IP TV Pricing 4-27-09.xls."  At this stage of the Hyatt RFI, Hyatt requested a quote for a "127 room hotel installation with FTG, VoID, IPTV based on 33-channel lineup."  Hyatt's specific selection of the High and Standard Definition channels to be included is identified in this spreadsheet.  The second stage Hyatt RFI requests itemization on a number of "one time fees," such as hardware and installation costs, as well as ongoing "Monthly Fees."

51.     Having possession of the second stage Hyatt RFI spreadsheet would provide PureHD and SolutionInc with significant benefit in marketing competitive services to Hyatt because the spreadsheet file provides a detailed roadmap of the products and services that Hyatt has determined to proceed with.

52.     Guest-Tek received the Second Stage Hyatt RFI request and "Multi-Vendor IP TV Pricing 4-27-09.xls" file on April 28, 2009.  This file was not a published document and was not publicly available.  Just two (2) days later, on April 30, 2009, a file was created on a USB device connected to Pullen's laptop and labeled "TOMSUSB" by the name of "Hyatt Multi-Vendor_IP_TV_Pricing_4-27-09.xls."   This file was placed in a directory labeled "NewCo/Sales."

53.     Guest-Tek believes that the file that was created on "TOMSUSB" is in fact the second stage Hyatt RFI spreadsheet, and that Defendants' possession of this document was to compete with Guest-Tek on future business with Hyatt.

54.     By way of further example, other files on Pullen's USB drive in the "NewCo" directory are titled "Sales Presentation draft 5-1-09.ppt" and "Sales_Presentation_draft_5-1-09_v1 [1].ppt."  The "Sales Presentation" file, which was recovered from Pullen's laptop computer, is a Power Point presentation for PureHD, created using Guest-Tek's software license and copied from Pullen's Guest-Tek computer to his USB drive on May 1, 2009, when he was employed by Guest-Tek.  The metadata pertaining to "Sales Presentation draft 5-1-09.ppt" lists the author as "wfrisch" and the company as "Guest-Tek."  These two attributes pertain to the Microsoft Office license used to create the document.  "Wfrisch" refers to Wayne Frisch, who was formerly employed by Guest-Tek as its Marketing Manager.  Furthermore, the document was last saved by an individual named "Christopher Holman" ("Holman") who, discovery reflects, was engaged by Defendants to act as a sales agent for PureHD.  Upon information and belief, Pullen, through PureHD, used Guest-Tek's computer and licensed software to create marketing materials for a competing enterprise in violation of his fiduciary duties to Guest-Tek.

**Knowing He was Planning on Setting Up a Competing Entity, Defendant Pullen Copied His Outlook "Inbox," "Calendar" and "Contacts" to a CD on April 1, 2009 and May 2, 2009, Which Contained Guest-Tek's Confidential and Proprietary Information**

55.     Pullen's breach of his fiduciary duty is not limited to copying files to his computers and USB drives.  Pullen made a .pst file of his entire e-mail inbox, contacts and calendar and burned that .pst file to a disc on April 1, 2009.

56.     A Microsoft .pst file is an archive of Microsoft Outlook data.  A .pst file can be created automatically by Microsoft Outlook but also manually by the person with access to the Outlook mailbox.  Automatically created .pst files usually contain a full replica of the mailbox, calendar, address book, etc.  Manually created .pst files can be created by exporting selected pieces of the mailbox.  Pullen created manual copies of his .pst files beginning at least as early as January 2009.  Pullen burned his .pst files to a DVD in order to have access to them after he left Guest-Tek and formed PureHD.  The evidence indicates that Pullen copied his .pst files on April 2, 1009 and May 2, 2009, one day before he resigned.

57.     When Pullen created the .pst files on May 2, 2009, Pullen knew he was going to resign within 24 hours.  Pullen had no legitimate business reason to create the .pst files of his Outlook inbox, contacts and calendar where he knew he was resigning immediately thereafter.  Moreover, Pullen had a VPN connection to Guest-Tek's servers where his Outlook data was stored, so there was no need to make independent personal copies of the information unless he intended on using that information for his personal benefit and the benefit of Defendants.

58.     The May 2, 2009 inbox alone included literally tens of thousands of Guest-Tek emails and attachments containing confidential and proprietary information and trade secrets.

59.     It is impossible to overstate the amount of confidential and proprietary information and trade secrets contained in his Outlook inbox.  However, by way of example, confidential and proprietary nature of the information contained in the .pst inbox file is indicated

17

by the following names of Pullen's folders in his inbox: "Administration," "Business

Development," "Finance," "Human Resources," "Legal," "Marketing," "Operations," "Research

and Development" and "Sales." Again, by way of example to show the volume of confidential

Guest-Tek material that Pullen misappropriated, the "Research and Development" file alone

contains thirty-five (35) sub files. His "Sales" folder contains approximately 87 subfolders of

hospitality companies such as Archon, Hilton, Hyatt, Marriott, etc. These folders include such

Guest-Tek confidential and proprietary information as its pricing information and confidential

responses to various hotel RFP's. Pullen also had responsibility for sales and business

development in Canada, where he managed a sales team. Under the "Business Development"

folder of his inbox, Pullen has separate folders set up for such Canadian companies as Rogers

Cable and Shaw Cable, which folders include confidential business information concerning

Guest-Tek's contract negotiations and relationships with those two cable companies and hotel

properties serviced by those cable companies.

     60.    The foregoing information found in the May 2, 2009 .pst files is precisely the type

of information that Guest-Tek (or any company, in any industry) would not want its competitors

to possess. However, because of the fact that Pullen, with the other Defendants, misappropriated

this information upon information and belief and breached his fiduciary duties, he had all of

Guest-Tek's most sensitive information as the President and founder of PureHD.

     61.    The information contained in the .pst file covers all aspects of Guest-Tek's

business. For example, the copied .pst file includes a March 26, 2009 email and attached quote

for the Waikoloa Beach Marriott Resort. This confidential Guest-Tek quote, including the

services offered, the technology used, technical requirements and price for the project, is located

in Pullen's Inbox .pst file and Guest-Tek believes that Pullen remains in possession of this confidential document.

62.     Pullen also was privy to a highly sensitive confidential and proprietary document which lists all the new hotels in the United States and Canada the Marriott Corporation plans to open in the second half of 2009 ("New Hotel List").  The New Hotel List, obtained by Guest-Tek on a confidential basis, not only lists all the hotels that Marriott plans on opening, but it lists the owner, the manager, the franchisee of the new hotel, the address, the telephone and facsimile numbers.  The New Hotel List is a password protected document.  This is precisely the type of confidential contact information that Guest-Tek and its competitors need to solicit and sell their services to the potential new customers.  Pullen knew the Hotel List was a highly confidential document, and he repeatedly requested that he be given access to it.  The document was emailed to him on April 29, 2009, just days before he resigned.  This document is in the Inbox .pst file Pullen created on May 2, 2009.  Pullen is in possession of this document, which provides Defendants with an unfair competitive advantage.

63.     The Hyatt RFI, the Archon RFP and Response (described below), the Waikoloa Beach Marriott Resort quote, and the New Hotel List, are just a small sample of the confidential and proprietary information Pullen misappropriated.  With this information and the countless other documents like it, Defendants have access to Guest-Tek's cost and bidding structure, specific vendor relationships as well as specific details on a number of projects on which it will likely bid in the New Hotel List. This is precisely the type of information that is confidential and proprietary to Guest-Tek and Pullen's misappropriation of this information is a breach of his fiduciary duty.

19

64.     As part of his plan to misappropriate Guest-Tek's confidential information, trade secrets and business proprietary information, Pullen failed to disclose to Guest-Tek that he maintained possession of the .pst files and thousands of other Guest-Tek electronic files, failed to return them to Guest-Tek and actively misrepresented to Guest-Tek that he was in possession of such information.

**Pullen Disclosed Guest-Tek's Confidential and Proprietary Information to Lavigne and SolutionInc Because Lavigne and SolutionInc Were and Continue to Be Intimately Involved in the Formation and Operation of PureHD**

65.     Revealing Guest-Tek's confidential information, trade secrets and/or business proprietary information to a competitor is a breach of Pullen's fiduciary duties. As Pullen is the founder and President of PureHD, he necessarily has revealed it to a competitor. Many of Guest-Tek's files were found stored on PureHD's network. Moreover, discovery has revealed that Pullen repeatedly shared Guest-Tek's confidential and proprietary information with Lavigne and SolutionInc as part of their conspiracy against Guest-Tek during the formation of PureHD while Pullen was employed by Guest-Tek. Lavigne and SolutionInc's knowing receipt and retention of that information constitutes aiding and abetting Pullen's breach of fiduciary duty and aiding and abetting his conversion of Guest-Tek's property.

66.     As early as January 20, 2009, Pullen was sending proposed financial plans to Lavigne and SolutionInc for NewCo (PureHD). Pullen also sent the proposed financial plan to Chuck Siemonsma who was working with Defendants in establishing NewCo (PureHD). Based on a document produced by Defendants in April 2009, upon information and belief, the January financial plan identified Guest-Tek customers and prospective customers targeted by Defendants.

67.     As part of their concerted action with Pullen and PureHD, in February 2009, under an email captioned "Update on action items", Lavigne and SolutionInc inquired as to Pullen about who was providing video services to the International Hotel Group ("IHG"). In

response to this query, Pullen revealed to Lavigne Guest-Tek's confidential business plans regarding clients Guest-Tek was targeting including, for example, IHG. In fact, Guest-Tek made a presentation to IHG to provide FTG services. Guest-Tek had numerous meetings and made proposals to IHG in the hopes of obtaining corporate approval of Guest-Tek as a licensed vendor, i.e., a "license to hunt" within the group and their 40 company owned sites. As a result of this sales process, Pullen would have known the names of contacts at the individual hotels, the channel lineups, what properties they own and which they manage. Because selling into the hospitality industry is such a complicated process involving myriad layers of ownership, this information was critical to Guest-Tek's efforts to secure business from IHG and other hotel owners and management companies. Upon information and belief, Pullen shared this information with Defendants.

68.     In working with Lavigne and SolutionInc to establish PureHD as a competitor to Guest-Tek, Pullen transmitted numerous business plans to Defendants for their consideration and input. In one such plan, prepared in February 2009, Pullen made clear that the goal of the new company is to make a statement that the new entity is a "major FTG provider in the hospitality market." Moreover, the February plan contemplated that NewCo (PureHD) would be established by March 1, 2009. To accomplish that end, Pullen proposed leveraging his knowledge of Guest-Tek's contracts. Pullen further proposed hiring Lee McKenna as Chief Video Officer for Defendants. Again, Mr. McKenna was instrumental in developing Guest-Tek's FTG delivery methodology. Further, Defendants' February plan indicated that NewCo (PureHD) would utilize SolutionInc's gateway to integrate VideoPropulsion as part of the FTG service. This evidences that SolutionInc was not only financing NewCo (PureHD), but as early as February 2009 had an active role in its unlawful activities and was involved in NewCo's (PureHD's) provision of

21

services and was part and parcel of the plan to misappropriate Guest-Tek's confidential information to unlawfully compete with Guest-Tek.

69.     Lavigne and SolutionInc's assistance in Pullen's breach of his fiduciary duty and their role in the conspiracy is further evidenced by the fact that Lavigne, on behalf of SolutionInc and NewCo (PureHD), made an offer of employment to Lee McKenna on February 25, 2009. At the time, Pullen was still an officer of Guest-Tek, yet he, with the assistance of Lavigne, is attempting to solicit one of the key architects of Guest-Tek's system.  Lavigne's offer was transmitted to Pullen's home email account in Massachusetts and Pullen forwarded the offer to Mr. McKenna.  The offer letter stated that Mr. McKenna would be employed by SolutionInc Technologies Limited.  Mr. McKenna's incentive compensation, however, was tied to the business success of NewCo (PureHD) and he was to receive stock in NewCo upon achieving certain NewCo business goals.

70.     Pullen believed that McKenna's hire was essential to NewCo (PureHD), particularly with regard to his knowledge of the technology and the speed with which they could get to market.  In other words, McKenna was seen as critical to Defendants' plan to misappropriate Guest-Tek's FTG delivery methodology.  In attempting to hire McKenna, Lavigne and SolutionInc aided and abetted this breach of fiduciary duty and conspired against Guest-Tek.

71.     Ultimately, McKenna did not accept employment with SolutionInc. In March 2009, after McKenna declined employment, Pullen proposed to Lavigne and SolutionInc that SolutionInc hire McKenna's subordinate because he was seen as someone who could execute in the field and build the racks containing FTG delivery methodology.  Defendants were simply

moving through the ranks of Guest-Tek employees to find people who could replicate Guest-Tek's FTG delivery methodology.

72.     After Lee McKenna declined to join Defendants' enterprise, Pullen emailed Lavigne and SolutionInc in April 2009, and tried to facilitate Lavigne and SolutionInc hiring Brad Adams and Diego Fontes. These were two Guest-Tek employees also with direct knowledge of Guest-Tek's FTG delivery methodology. Mr. Adams was manager of FTG installations at Guest-Tek and Mr. Fontes is Product Manager for FTG services. As part of that recruitment effort, Pullen shared with Lavigne and SolutionInc the appropriate salary and type of equity defendants should offer to Mr. Adams and Mr. Fontes. Facilitating the departure of employees in order to capitalize on Guest-Tek's delivery methodology was against Guest-Tek's interests and a breach of Pullen's fiduciary duty. Lavigne and SolutionInc's aided and abetted Pullen's breach of fiduciary duty and conspired with him to accomplish that task. Ultimately, Lavigne offered Mr. Adams a position as Director of Video Operations for SolutionInc Technologies Limited on June 2, 2009, at the salary recommended by Pullen. Brad Adams was hired by SolutionInc.

73.     Pullen's February 2009 NewCo plan identifies several clients and projects, all of which Pullen learned of while working at Guest-Tek, including the Archon RFP, which Pullen misappropriated from Guest-Tek. Additionally, the plan identifies being awarded the Hyatt RFP, which Pullen also misappropriated from Guest-Tek. The February 2009 plan further a hotel in Boston as an initial customer for the new company, a hotel for which Pullen had prepared a Guest-Tek FTG proposal during that same month. Pursuant to the February plan, Defendants now endeavored to make the Seaport Hotel a PureHD customer. The February plan also identifies a number of large hotel groups who were then actively engaged in a RFP process for

television services, information which Pullen was privy to as a result of his employment position with Guest-Tek.

74.     On March 26, 2009, Pullen produced an 80-day plan for "New-Corp".  This revised plan again identifies Brad Adams and Diego Fontes as two people who should be hired from Guest-Tek.

75.     In the March plan, Defendants propose to secure "100 sites in rapid form," some at zero margin, all at "aggressive margin".  Upon information and belief, because Defendants had not incurred any research and development costs and were simply relying on Guest-Tek's delivery methodology, they were able to offer very low bid prices to their initial customers and gain a "head start" in the market.  In addition, to the Seaport Hotel in Boston, Defendants identify the Shaw Whistler project, which included 12 sites as initial customers.  Both the Seaport Hotel project and the Shaw Whistler project, were projects that Pullen became aware of while employed at Guest-Tek.  Guest-Tek expected to get the Shaw Whistler project, but then inexplicably Guest-Tek was not awarded the contract.  Additionally, Defendants again identify, among others, Archon, Hyatt and IHG as entities seeking services immediately.  These are projects that Pullen became aware of only through his employment at Guest-Tek and Defendants are using that confidential proprietary information to unlawfully compete with Guest-Tek in violation of Pullen's fiduciary duties.

76.     In furtherance of Defendants' conspiracy, the March plan also indicates that Lavigne had specific tasks to be performed in April on behalf of NewCo (PureHD) including, among other things, procuring exclusive agreements and licenses for NewCo (PureHD).  Similarly, Randy Currie, SolutionInc's Chief Technology Officer was also working on NewCo's (PureHD) behalf setting up a DISH Lab in Halifax and establishing a timeline for the first

24

installation, among other things.  Lavigne and SolutionInc's involvement in the operations of PureHD make it clear they are more than a passive investor in the enterprise.  Lavigne and SolutionInc were central to both the formation and operation of PureHD and thus aided and abetted Pullen's breach of fiduciary duties and his conversion.

77.     As indicated in the March plan, Defendants planned to use Holman as a sales agent for NewCo (PureHD).  Pullen wanted to use Holman while Pullen was "underground." Lavigne agreed with this idea and communicated his assent to this scheme to Pullen's home email account in Massachusetts.  In furtherance of their scheme to engage Holman to hide Pullen, on March 18, 2009, Pullen, during normal business hours and while he was being paid by Guest-Tek and from his personal email account, sent to Holman a copy of Guest-Tek's FTG Solutions for United States Hotels.  This document, created for Guest-Tek by Pullen with a date of February 13, 2009, is used by Guest-Tek's sales force to market and sell Guest-Tek's FTG Solutions to customers, and contains pricing information.  In fact, the subject line of the email by which Pullen transmitted this Guest-Tek document to Holman states "pricing."  There was no legitimate business reason for Pullen to send this document to Holman on behalf of Guest-Tek. Upon information and belief, Pullen provided this information to assist Holman to unlawfully compete with Guest-Tek on behalf of Defendants.

78.     On March 30, 2009, Pullen, during normal business hours and while he was being paid by Guest-Tek and from his personal email account, sent to Holman a copy of Guest-Tek's FTG Solution with Shaw Cablesystems GP Proposal.  This document, created for Guest-Tek by Pullen with a date of March 26, 2009, was used by Guest-Tek to market and sell its FTG solution to hotels in western Canada that utilized Shaw Cable as the television provider.  Shaw Cable was not able to provide "HD" television without a set top box and this was a proposal by Guest-Tek

to install a "head end" for customers to view television in HD. The document contains Guest-Tek's pricing information. There was no legitimate business reason for Pullen to send this document to Holman on behalf of Guest-Tek. Upon information and belief, Pullen provided this information to assist Holman to unlawfully compete with Guest-Tek on behalf of Defendants.

79.     According to their March plan,  Holman was to contact Tom Pullen's "Top 50 List." Given that Pullen had worked since 2005 with Guest-Tek, upon information and belief, Pullen was directing Holman to Guest-Tek's customers and supplying Holman with confidential information about those customers to assist in his solicitation.

80.     Pullen's scheming with Defendants continued in April 2009.  In April 2009, Pullen sent an "FTG Corp. Income Statement 4-7-09" to Lavigne and Gary Dodge at SolutionInc.  Once again, Pullen sent the email from his personal account during regular business hours.  In his cover email to the Income Statement, Pullen stated, in part,

> I am very concerned about equity structure, corporate structure and exit strategy from a SolutionINC [sic] parent and retaining similar structures as outlined and retaining some sembleance [sic] of autonomy so NewCo appears Independent when appropriate and part of SolutionINC [sic] when appropriate.

This email once again evidences the interconnection between PureHD and SolutionInc.  The proposed Income Statement once again identifies Archon as a potential customer as well as the Shaw Whistler project.  Notably, the Income Statement is marked "confidential" manifesting Defendants' knowledge that information such as business plans, financial information and potential customers and marketing strategies, precisely the type of information misappropriated by Pullen from Guest-Tek and disclosed to Defendants, was Guest-Tek's confidential and proprietary information.

81.     In another email, once again sent during regular business hours, Pullen described PureHD and SolutionInc as follows:

Super secret, but I am leaving Guest-Tek on April 20th when my commission check clears to start a new corporation called PURE HD, which is a FTG company for hotels, no VOD.  I have raised $3 MM in equity and $50 MM in debt working with SolutionInc . . . .

Super quiet, or I get fired before commission check.

82.     Subsequent to this email communication, Pullen communicated with Lavigne on April 9, 2009 asking, among other things, about PureHD's structure under SolutionInc and when Lavigne would provide language describing Pullen's employment.  Lavigne responded that he would prepare the document but that Pullen and Lavigne need to discuss salary issues.

83.     In further evidence of Defendants' improper motives, on April 15, 2009, Pullen conveyed the need to attend the DISH Summit in Las Vegas in May 2009, which he described as a "key event for the team to attend."  Pullen recommended that SolutionInc and Lavigne also attend the DISH Summit.  With regard to Mr. Fontes and Mr. Adams, Pullen stated, "They will attend the DISH Summit on GTK's dime and then they are quitting."

### Defendants Have Misappropriated Disclosed and Used Guest-Tek's Confidential and Proprietary Information to Unlawfully Compete with Guest-Tek

84.     Defendants have misappropriated and disclosed Guest-Tek's confidential information, trade secrets and proprietary business information in furtherance of their conspiracy.  For example, part of Defendants' plan was to secure an EchoStar license.

85.     In communications with Lavigne and SolutionInc, Pullen described this as his most important business development activity.  To achieve this goal, Pullen, in concert with Lavigne and SolutionInc and with their knowledge that he was breaching his fiduciary duty, misappropriated Guest-Tek's confidential and proprietary information.  Specifically, on May 1, 2009, immediately before he resigned, Pullen sent to Lavigne and others at SolutionInc from his personal email account Guest-Tek's draft "Promotional Program Non-Binding Term Sheet"

("Term Sheet") with EchoStar Satellite L.L.C. The Term Sheet contained proposed terms of Guest-Tek's contractual relationship with EchoStar.  More importantly, because the document was a draft, it contained Guest-Tek's internal comments to the proposed terms of the relationship. Every page of the document was marked "Confidential and Proprietary" and therefore Pullen, Lavigne and SolutionInc knew that this was a confidential Guest-Tek document that should not be disclosed to a third-party.  EchoStar is part of DISH Network

86.     PureHD has partnered with DISH Network to provide television signal as part of its FTG package.  This draft "Term Sheet" is helpful in Defendants' negotiations with DISH because it would give them a structure for their arrangement with DISH and it also shows what PureHD's competitor's – Guest-Tek's – pricing is.  This document gave Defendants a "head start" in competing with Guest-Tek by utilizing Guest-Tek's confidential and proprietary information.  By receiving this document, among others, from Pullen's home account, Lavigne aided and abetted Pullen's breach of fiduciary duty and conspired against Guest-Tek.

87.     Similarly, on May 2, 2009, days before Pullen resigned, he sent to Holman with a copy to SolutionInc a template of a Guest-Tek reseller agreement.  Pullen sent this document from his personal email account.  This is just another example of Defendants' concerted action to misappropriate Guest-Tek's confidential information, trade secrets and proprietary business information and conspire to set up a company to unlawfully compete with Guest-Tek. SolutionInc's receipt of this document was part of its aiding and abetting of Pullen's breach of fiduciary duty.

88.     Also by way of example, in or about December 2008, Guest-Tek received a Request for Proposal from The Archon Hospitality Group ("Archon RFP").  The Archon RFP sought proposals for, among other things, FTG delivery, Pay-Per-View delivery and Project

Management for a project involving 290 hotel properties owned and/or managed by The Archon

Hospitality Group.  Guest-Tek was selected to submit a RFP because of its relationship with

Archon, its goodwill, its product offerings and its technical capabilities and expertise.

89.     The Archon RFP received by Guest-Tek consisted of two documents: a Word

document entitled "Archon Hospitality Project Rabbit Ears RFP.doc" describing Archon

Hospitality Group and the scope of the project; and, second, an Excel spreadsheet file entitled

"Rabbit Ears Master.xls", which file lists 247 hotel properties by address, phone number, general

manager name and contact information, together with detailed specifications for each property,

including current FTG vendor, comments on existing FTG contract status and total number of

televisions in the property.  The Archon RFP documents were not published documents and were

not publicly available.

90.     As previously alleged, the information contained in the .pst file covers all aspects

of Guest-Tek's business.  For example, a review of Pullen's "Sales/Archon" mail folder reveals

that Pullen was involved with a team of Guest-Tek employees in the preparation of Guest-Tek's

response to the Archon RFP.  In preparing its response, Guest-Tek utilized relationships with

vendors and leasing partners.  Moreover, Guest-Tek utilized unique financial models and

financing arrangements.  The .pst file of Pullen's Outlook inbox in his possession includes

Guest-Tek's pricing response to Archon's RFP.  This is highly confidential and proprietary

information and all information Pullen, PureHD, and SolutionInc possesses.

91.     Having possession of the Archon RFP Word document and the detailed

spreadsheet provides Guest-Tek with a competitive advantage in its efforts to respond to the RFP

and to continue to market its products and services to these properties after and separate and

apart from the RFP.  Similarly, having possession of this detailed spreadsheet would provide a

Guest-Tek competitor with significant benefit in marketing competitive services to the hotel properties and owners identified in the spreadsheet.

92.     Pullen was provided with access to the Archon RFP documents in his capacity as Vice President of North American Sales for Guest-Tek, and he played a substantial role in Guest-Tek's submission to the Archon RFP.

93.     On January 21, 2009, a file entitled "Archon Rabbit Ears Master.xls" was moved to a directory named "Newco/sales" on TOMSUSB drive, and was accessed on the TOMSUSB drive as recently as April 30, 2009.  On information and belief, the file that was placed on TOMSUSB drive is the spreadsheet file part of the Archon RFP that was provided by Archon to Guest-Tek.

94.     Guest-Tek's forensic review of Pullen's computer also identified a file fragment indicating that a file entitled "Archon Hospitality Project Rabbit Ears RFP.doc" was placed on the TOMSUSB drive in a folder entitled "NewCo\sales."

95.     Guest-Tek believes that the "Archon Rabbit Ears Master.xls" file and "Archon Hospitality Project Rabbit Ears RFP.doc" file that were created on "TOMSUSB" are in fact the Archon RFP documents, and that Pullen, PureHD and Defendants are in possession of this document and are using it to compete with Guest-Tek on future business with Archon.

96.     Upon information and belief, after resigning from Guest-Tek, Pullen copied the Archon RFP documents to his PureHD computer, and was able to access them in preparing PureHD's proposal to Archon.

97.     Defendants' misappropriated and disclosed Guest-Tek's confidential and proprietary information in submitting their own bid in response to the Archon RFP.

98.     PureHD, along with SolutionInc, submitted a proposal to Archon in response to the RFP in May 2009.  In furtherance of that proposal, after leaving Guest-Tek, Pullen and PureHD accessed Guest-Tek's sales engineer's schematic of the front and back of the rack system developed by Guest-Tek to deliver its FTG solutions.  Pullen had saved this Guest-Tek created document on his server and PureHD computer.  Defendants then copied Guest-Tek's sales engineer schematic of the FTG delivery methodology and included it PureHD's FTG Proposal to Archon.

99.     In this same proposal, which relies on Guest-Tek's technology, PureHD explicitly describes SolutionInc as its partner.  Notably, Defendants marked every page of their proposal as "confidential and proprietary".  Defendants knew that proposals such as this were confidential. Notwithstanding this knowledge, Defendants misappropriated Guest-Tek's proposals including its Archon proposal.

100.     PureHD's Archon proposal further copies verbatim certain portions of Guest-Tek's Archon proposal, including the use of Guest-Tek's graphic file of the logos of certain HD channels and incorporates Guest-Tek's proprietary information into its own proposal as its own.

101.     In a further misappropriation of Guest-Tek's confidential and proprietary information, Defendants also copied, almost verbatim, Guest-Tek's Bill of Materials.  A Bill of Materials is like the recipe of ingredients for a particular service.  Rather, than expend the time, energy and resources to develop their own Bill of Materials, Defendants have simply copied Guest-Tek's Bill of Materials.  By misappropriating this confidential and proprietary information and using it to make proposals, Pullen is in breach of his fiduciary duty and PureHD and SolutionInc are unlawfully competing with Guest-Tek and Lavigne, SolutionInc are aiding and abetting Pullen's breach of fiduciary duty.

31

102.    By way of further example, Guest-Tek has had a business relationship with The Related Group, an entity that develops and/or owns hotel properties.  Guest-Tek has also had a relationship with KOR Group, a hotel management company.  As a result of his employment with Guest-Tek, Pullen was introduced to the persons at Related and KOR responsible for making technology purchases at their hotels.

103.    In or about late 2008 and early 2009, Guest-Tek was solicited by Related and/or KOR to submit pricing for FTG, VOD and HSIA for a hotel property known as "Viceroy Snowmass."  In response, Guest-Tek invested time and energy in preparing proposed solutions and pricing for Viceroy Snowmass.  Pullen was intimately involved in Guest-Tek's development of a response for the Viceroy Snowmass project.

104.    For example, Pullen was privy to Guest-Tek's pricing proposal to KOR, wherein Guest-Tek submitted pricing for four (4) different options.  Pullen had saved this pricing proposal in a KOR folder in his Outlook inbox, and this file was included among the emails he saved in his May 2, 2009 .pst file.

105.    Soon after leaving Guest-Tek, Pullen and PureHD submitted a proposal to Viceroy Snowmass for the FTG service.  The PureHD proposal includes language that is virtually identical to Guest-Tek's language, makes statements regarding the uniqueness of its capabilities that are not accurate, and includes a Bill of Materials that is an almost carbon copy of Guest-Tek's.

106.    As a result of its proposal, on information and belief, PureHD was awarded the FTG piece of the Viceroy Snowmass project.  Guest-Tek was not awarded the FTG piece.

107.    Defendants have caused economic damage to Guest-Tek. Not only did Guest-Tek compensate Pullen for the period he was in breach of his duty of loyalty, but in a voice mail

message to a Guest-Tek employee on July 2, 2009, Pullen stated "I got lots of business coming forward." Any revenue generated by Defendants is as a result of Defendants' unlawful conduct and is damage to Guest-Tek.

### Pullen, in Concert With The Other Defendants, Actively Deceived Guest-Tek For Months In Setting Up His New Company While Occupying A Position Of Trust At Guest-Tek

108.    As indicated by the creation of his "NewCo" directory in August 2008, Pullen was planning on creating a competitive entity with Guest-Tek for at least eight (8) months before his sudden resignation. Despite these intentions, as Vice-President for North American Sales, Pullen had access to the most sensitive sales, customer, pricing and product development information and plans. Pullen actively participated in all aspects of Guest-Tek's business in order to deceptively acquire as much confidential information as possible and take additional steps to establish his competing entity including working with a competitor.

109.    Pullen's conduct with regard to the New Hotel List is indicative of his deceptive conduct. Pullen aggressively pushed to gain access to the New Hotel List despite the fact that he did not need access to it. Reluctantly, Guest-Tek gave Pullen access to the New Hotel List on April 29, 2009. Pullen abruptly resigned four days later.

110.    Similarly, an executive meeting took place on February 4-5, 2009 in Calgary. Pullen pushed hard to attend that meeting. During the meeting senior executives discussed Guest-Tek's strategy for success with regards to Sales, Operations and Research & Development. The attendees also discussed market trends and budgetary issues. Pullen attended this meeting under the guise that he was at Guest-Tek for the long-term. The reality was he absorbed the information discussed while he was setting up a new company and resigned a few months later. Moreover, the forensic examination and discovery to date reveal that over a period of many months, Pullen shared Guest-Tek's confidential and proprietary information with SolutionInc and

33

Lavigne as part of their conspiracy to misappropriate Guest-Tek's confidential and proprietary information, breach Pullen's fiduciary duty and unlawfully compete with Guest-Tek.

111.   Pullen's deception and breach of fiduciary duty is revealed by the fact that Pullen spent significant amounts of time working to establish PureHD while he was employed by Guest-Tek.  Diverting his time and attention from his duties at Guest-Tek is a breach of his fiduciary obligations.  Lavigne and SolutionInc aided and abetted this breach as much of the diverted time was spent communicating with them while Pullen was in his home office in Massachusetts.

112.   Pullen's deception and breach of fiduciary duty is revealed by the fact that he communicated with Lavigne and SolutionInc about their formation of PureHD regularly and consistently during normal business hours when he was supposed to be acting on behalf of Guest-Tek.  Pullen used a personal email account for these communications.  Indeed, during one such communication, Pullen advised Lavigne and SolutionInc, "this is my personal email and the only email to use on this topic."  Defendants knew his conduct was wrong and a breach of fiduciary duty and complied with Pullen's command and only communicated with him using his personal email account.  By way of example only, while being paid by Guest-Tek, Pullen, among other things, arranged for a phone call with Lavigne and Carl Pick of VideoPropulsion, arranged for PureHD to attend the DISH Summit conference in Las Vegas with Lavigne, and sent proposed business plans and estimated financial statements for PureHD.  In another instance, on February 17, 2009, Pullen emailed Lavigne and informed him that he was "ready to conclude the deal" that week.  Pullen then arranged to speak with Lavigne after he concluded a Guest-Tek call.  In another instance, on February 17, 2009, Pullen emailed Lavinge and informed him that he was "ready to conclude the deal: that week.  Pullen then arranged to speak with Lavigne after

he concluded a Guest-Tek call.  These are but a few examples as to how Pullen, in concert with Lavigne and SolutionInc, diverted his attention away from his Guest-Tek duties in breach of his fiduciary duty.  All the while, Guest-Tek was compensating Pullen to work on its behalf, not on behalf of his competing entity.

113.    In another instance, on both April 30, 2009 and May 1, 2009, Pullen notified Guest-Tek in writing that he would not be working those days because he was "down for the count" with what could be "the swine flu."  To the contrary, rather than being home sick Pullen was actively engaged on those very days in working on behalf of PureHD.  For instance, on information and belief, on April 30, 2009, Pullen was on a plane to Halifax, where he met with Lavigne and SolutionInc on May 1, 2009.  One of the topics that was on the agenda to be discussed at this meeting was the recruitment and hiring of other Guest-Tek employees, Brad Adams and Diego Fontes.  This was all done while Pullen was supposed to be working for and being paid by Guest-Tek.

114.    Forensic examination also reveals that Pullen created the PureHD sales presentation document on May 1, 2009, when he was supposedly too sick to work for Guest-Tek.

115.    Pullen breached his fiduciary duties to Guest-Tek and Lavigne and SolutionInc aided and abetted this breach by being actively engaged in the PureHD competitive enterprise with Defendants while he was still an employee of Guest-Tek, and on days when he informed Guest-Tek that he was too sick to work.

116.    During the course of his employment and using his Guest-Tek computer, Pullen was working with a designer named Lauren Brown to develop the PureHD logo.

117.    Not only did Pullen deceptively acquire Guest-Tek's confidential information, trade secrets and proprietary business information, but he pushed Guest-Tek to develop a SD

product over coaxial cable, despite the fact that Guest-Tek's Vice President of Marketing did not want to pursue this product line. At Pullen's insistence, however, Guest-Tek expended substantial money and hours of time to develop this program. In fact, at Pullen's urging, Guest-Tek was required to develop a whole new marketing program from scratch and develop both the technical and financial models to offer this product. Armed with this information developed by Guest-Tek, PureHD and Defendants are now marketing this product offering.

118. Just a few weeks before his sudden resignation, while in attendance at a Guest-Tek quarterly sales meeting, Pullen was specifically asked if he was planning to leave. Despite the fact that he had been actively engaged in establishing a competing enterprise, Pullen denied that he was leaving.

**As Part of Their Improper Conduct, Pullen Diverted Corporate Opportunities to Defendants in Furtherance of Their Conspiracy and in Breach of Pullen's Fiduciary Duties**

119. Pullen also diverted Guest-Tek corporate opportunities to Lavigne and SolutionInc. For example, on February 23, 2009, long before his resignation from Guest-Tek, Pullen sent an email to Lavigne with the subject line "another lead . . ." His communication to Lavigne mentioned twelve deals totaling 1,500 units for high speed internet and perhaps voice related services. The business opportunity described in this email is within Guest-Tek's business, yet Pullen did not bring this opportunity to the attention of Guest-Tek. Pullen sent this email to Lavigne during regular business hours when he should have been working for Guest-Tek.

120. By way of another example, in March 2009 Pullen sent Lavigne information he received from Shaw Whistler, presumably information he received in his capacity as a Guest-Tek employee, about installing HDTV at a large number of hotels in time for the Vancouver Olympics. Pullen advised Lavigne to "move fast" on the project. Pullen also conveyed to McKenna, Lavigne and SolutionInc that getting this project may be the way to hire McKenna for

NewCo (PureHD).  The business opportunity described in this email is within Guest-Tek's business, yet Pullen did not bring this opportunity to the attention of Guest-Tek.  In his capacity as Vice-President of Sales, North America, Pullen should have brought this information to the attention of Guest-Tek.  In breach of his fiduciary duty, he did not.  Rather, he sent it to Defendants.

121.   In an email correspondence dated April 27, 2009 to DOCOMO interTouch, Pullen also indicated that he wanted to move opportunities in excess of 10,000 rooms away from Guest-Tek and to DOCOMO interTouch because of purported "troubles Guest-Tek is having with integration" and fearing his reputation would be harmed.  Pullen indicated, "I am in my last few days/weeks at Guest-Tek, so this move of opportunities will be very fast."

122.   In addition to diverting opportunities away from Guest-Tek to SolutionInc, Pullen further appears to have been working on behalf of PureHD directly while at Guest-Tek, with Lavigne and SolutionInc's knowledge.  For example, on March 24, 2009, Pullen informed Lavigne that he was working on "Shaw . . . need help from your buddy at Shaw . . . . need to transfer the GTK contracts working on now . . . ."  Upon information and belief, Shaw refers to Shaw Cable.  Upon information and belief, Pullen was working on Shaw related projects for Guest-Tek but solicited Lavigne and SolutionInc's help in transferring that business over to PureHD.

123.   Similarly, on March 30, 2009, Pullen forwarded an email from Arnon Levy, Guest-Tek's Chief Executive Officer, to Chuck Siemonsma, a former Guest-Tek employee who has been involved in Defendants' enterprise.  The email from Mr. Levy to Pullen describes a potential business opportunity for Guest-Tek with Hilton.  Specifically, Mr. Levy's email described a positive relationship with the Chief Information Officer of the owner of a hotel chain

for which Guest-Tek provides services at 330 hotels. The Chief Information Officer agreed to help Guest-Tek obtain additional business from Hilton.  Pullen used his personal email, during working hours, to forward the email to Mr. Siemonsma and instruct Mr. Siemonsma to "make sure [the CIO] is managed."  Upon information and belief, Pullen forwarded this email with that instruction to interfere with Guest-Tek's future business opportunity with Hilton.

### Pullen Lied to Guest-Tek About What Information He Possessed, Did Not Return All of Guest-Tek's Property in His Possession and Reviewed Misappropriated Guest-Tek Documents After His Resignation

124.    Not surprisingly, Pullen's deception toward Guest-Tek continued after he abruptly left its employment.  By letter dated May 8, 2009, Guest-Tek demanded that Pullen return all of Guest-Tek's property, including all its confidential and proprietary information and electronically stored information.  A copy of this letter is attached hereto as Exhibit A.

125.    After several weeks of stalling, on May 27, 2009, Pullen returned his Guest-Tek laptop computers, some electronic media containing old .pst files and several boxes of documents.

126.    Significantly, Pullen returned a disc containing a .pst file of his Inbox through December 4, 2007.  He did not return a disc containing the April 1, 2009 .pst files, or the May 2, .pst files.  He also did not return "TOMSUSB" or any USB drive to which he copied Guest-Tek's confidential business information.  In other words, he did not return any of the confidential and proprietary information and trade secrets on the USB drives, the copied cd or the .pst files.

127.    When Guest-Tek requested that Pullen produce his e-mails for the period from January 2008 through May 2009, Pullen disingenuously responded that he did not possess any such information.  Moreover, his counsel stated that, "Mr. Pullen did not become associated with PureHD until he departed from Guest-Tek."  Once again, Pullen blatantly lied to Guest-Tek.

128.    By letter dated June 19, 2009, Guest-Tek again demanded that Pullen return the TOMSUSB device and any and all USB devices that at any time contained Guest-Tek documents or information, or that were connected at any time to his Guest-Tek laptop, together with all media containing .pst files.

129.    Pullen remains in possession of Guest-Tek's misappropriated confidential and proprietary information and has accessed, copied or reviewed such information after resigning from Guest-Tek.  By way of example only, Pullen reviewed an 80 page list of Guest-Tek North American customers, multiple proposals to customers, a FTG contract template, and FTG Matrix pricing.  These are but a few of the examples of misappropriated Guest-Tek information that Pullen has accessed since his resignation.  Retaining this information is a conversion of Guest-Tek's property and using and disclosing the information is unlawful conduct by Defendants.

130.    Pullen not only accessed Guest-Tek confidential and proprietary information after he departed, but he has transferred Guest-Tek confidential and proprietary information to his PureHD computers and failed to disclose the existence of thousands of files on his PureHD equipment after he departed.

131.    After the Stipulated Order was entered, unbeknownst to Guest-Tek, Pullen and PureHD possessed hundreds if not thousands of Guest-Tek business records, most of which were confidential and proprietary business information.  Guest-Tek's forensic review revealed, for example, that Mr. Pullen's Terastation and laptop computer contained numerous .pst files created from his Guest-Tek Outlook account, including the April 1, 2009 files, which Guest-Tek understood had been returned.  Pullen and PureHD's Terastation had a Guest-Tek folder, where over 500 files were created using Guest-Tek's Microsoft Office license.

**PureHD Is Falsely Advertising Its Capabilities Vis A Vis Guest-Tek**

132.    Guest-Tek and PureHD are direct competitors in the delivery of broadband technology solutions for the hospitality industry.  In short, they offer the equivalent of the triple play packages for hotels: telephone, internet and television services for hotel guests.  Guest-Tek uses the latest in technology, which means it provides internet through HSIA, telephone services using VoIP technology, and HDTV with a VOD and FTG capability.

133.    Guest-Tek's services, including those offered through Guest-Tek Interactive Entertainment Ltd., have been installed in more than 2,900 properties, including over 35 hotel brands and 40 independent boutique hotels.  Guest-Tek Interactive Entertainment Ltd. has a substantial business and derives substantial revenue from its Guest-Tek operations in the United States.

134.    For 2008, Guest-Tek Ltd. generated more than $32 million in revenue from its United States operations.  In total, Guest-Tek Ltd.'s revenue from its United States operations accounted for more than 80% of its total revenues in 2008

135.    PureHD is a newly established company that operates and markets its services through website with the domain name "www.purehd.com."  The PureHD website is registered to Pullen at 63 Brewster Road, in Sudbury, Massachusetts.  The PureHD website is hosted at IP Address 68.178.232.100, which is located in Scottsdale, Arizona.  Upon information and belief, GoDaddy.com, Inc. hosts PureHD's website.

136.    PureHD, through its false statements and representations of material fact on its website, is engaging in unfair competition and false advertisements in violation of the Lanham Act, 15 U.S.C. § 1125(a).  PureHD's website has made several false and misleading statements of fact when it describes PureHD as the "only" provider capable of delivering certain services that Guest-Tek can and does deliver.  PureHD's statements rise about mere puffery because the

statements are specific, measurable and verifiable claims of PureHD's superiority over other similar vendors, including Guest-Tek, which are false.

137.    Specifically, PureHD has made the following four false assertions of material facts in advertising on its website:

> PureHD is the only provider today of HDTV services that can comprehensively provide remote monitoring of FTG head-ends, as well as, remote maintenance to 100% of the HDTV channels nearly eliminating truck-roll costs to hotels.

> PureHD is the only provider delivering an Electronic Program Guide, multiple hotel channels, and a hotel launch page that are remotely managed and supported.

> PureHD is the only provider who can deliver Dynamic Channels On- Demand with "no-truck roll".

> PureHD is the only provider that gives hotel "Turn-On" channel control back to the property owner.

(Emphasis on PureHD website).  Each of these above statements are false and misleading because PureHD is not the "only" company able to provide these services.

138.    PureHD has repeated these false and misleading statements in its proposals to numerous hotels, stating that it's the "only" or a "unique" provider of these services.

139.    Pullen knows that Guest-Tek delivers the exact same services, which PureHD lists as being exclusive to PureHD.  Indeed, Pullen himself reviewed, edited and approved the content of various Guest-Tek advertising materials that clearly and expressly detail Guest-Tek's ability to provide the exact same services over which Pullen and PureHD now claim exclusive domain.

140.    Specifically, Guest-Tek spent extensive time and effort creating a "Triple Play Proposal Template" and a "Free to Guest Proposal Template" that were to be used by its salespeople as a form document which the sales person could use to create a simple, quick, and accurate presentation of Guest-Tek's services.  The templates would be customized in certain

respects for the customer, but for the most part, they were a ready-made presentation that resulted in consistency in the way Guest-Tek's sales people described their services and capabilities.

141.    Pullen extensively advocated for the creation of the templates.  Based on Pullen's position at Guest-Tek and Guest Tek's trust of Pullen, Guest-Tek gave Pullen, amongst others, the ability to review and comment on the content of the templates.  More importantly, Guest-Tek insisted that Pullen approve the templates before they were used.  Pullen, in fact, approved the content and use of both the "Triple Play Proposal Template" and the "Free to Guest Proposal Template."

142.    After the creation of the templates, Guest-Tek used the templates to generate and spin off other advertising materials which stated the services offered by Guest-Tek.  Guest-Tek often solicited Pullen's review, comment and approval on such advertisements.  However, because the advertisements were based on the templates approved by Pullen and others, Guest-Tek would not always insist on Pullen's approval as it did for the templates.  Nonetheless, Guest-Tek usually received Pullen's approval either in an informal conversation or his silent assent.

143.    As described below, each of the services in which PureHD has stated that it is the "only" provider capable of delivering is offered by Guest-Tek in fact, confirmed by Guest-Tek's advertising material, and known to Pullen.  Indeed, not only does Guest-Tek offer the same services, in many cases the language employed by PureHD and Pullen appears as if it was taken directly from Guest-Tek's advertisements.

144.    PureHD's first false statement of material fact is that it is the "only" provider today of HDTV services that can comprehensively provide remote monitoring of FTG head-

ends, as well as, remote maintenance to 100% of the HDTV channels nearly eliminating truck-

roll costs to hotels."

145.    Sophisticated hoteliers know that HD signals are digital and more prone to

disruption.  PureHD's advertisement is designed to prey on the fear that its hotel guests will be

without television while awaiting a service repair person.  Consequently, PureHD wants to

convince the hoteliers that it is the only company that can remotely monitor and fix any

distortion or disruption that may occur, without "truck-role", i.e., sending out a service person.

146.    Guest-Tek's Free to Guest Template touts its ability to actively monitor and

remotely maintain its channels. Indeed, Guest-Tek states that it provides the option of "remote

monitoring" and "remote maintenance" focusing, like PureHD's statement, on the maintenance

for "HD-FTG head ends" which "nearly eliminates truck rolls which costs hotels time & material

fees from cable companies."

147.    Guest-Tek in fact offers and delivers to its clients remote monitoring of FTG

head-ends, as well as remote maintenance to 100% of the HDTV channels, which nearly

eliminates truck-roll costs to hotels.  PureHD is not the "only" service provider capable offering

these services.

148.    PureHD's second false statement of material fact is that it is "the only provider

delivering an Electronic Program Guide, multiple hotel channels, and a hotel launch page that are

remotely managed and supported."

149.    An Electronic Program Guide ("EPG") refers to a television screen that lists

which networks (ABC, NBC, HBO, etc.) can be found on which channels.  Guest-Tek offers the

virtually identical service, only slightly better, called an "Interactive Programming Guide."

("IPG")  The only difference between an EPG and an IPG is that an IPG lets the hotel guest jump

to the channel by clicking on the channel name in the menu screen. This feature is not available on an EPG.

150.    Similarly, Guest-Tek offers its clients multiple hotel channels. As explained in Guest-Tek's "Triple Play Template," Guest-Tek can offer the hotel any number of "In-House Promotional Channels & Information Channels." These channels can be used to advertise the hotel's amenities: e.g., dining, spa, golf, etc., or for any other information that the hotel seeks so these channels can be used as "[p]romotional tool for in-house revenue opportunities."

151.    Lastly, Guest-Tek also offers a hotel launch page. PureHD's use of the term hotel launch page refers to the initial screen which appears when a hotel guest first "turns-on" the television. Two major suppliers and competitors do not allow the hotel to customize the "turn-on" channel or television home page. Hoteliers frequently want customers to be reminded of the hotel when they turn on their television. Instead of a standard menu screen that lists only movie options, a customized hotel launch page may have a picture of the hotel, or emphasize certain luxurious qualities of the hotel or room.

152.    Guest-Tek's Triple Play Template demonstrates that it offers its customers the same service under the feature headings "Hotel Imagery," which shows Guest-Tek's ability to create a "Menu system alignment with the design and décor of the hotel." Guest-Tek also offers "User Interface Customization," which allows the hotel to show its service or deliver a personalized welcome message to the guest. Under the heading "User Interface Customization" of the Triple-Play Template, Guest-Tek notes it's ability to allow the VOD system to "[l]ook and feel aligned to hotel branding and color scheme."

153.    In addition, Guest-Tek can remotely deliver, manage, and support these services. PureHD is not the "only" provider capable of delivering these services remotely because Guest-Tek can also provide these services remotely.

154.    PureHD's third false statement of material fact is that it is the "only provider who can deliver Dynamic Channels On- Demand with 'no-truck roll'."

155.    The term "Dynamic Channels" refers to the ability of a provider to alter the television programming for a particular room or block of rooms based on the occupants.  For example, if an Arab sheik rents the penthouse and a block of rooms at a hotel in New York, he may want to get Arabic channels in his room or the entire block. "Dynamic Channels" represents the ability to filter Arabic channels to the sheik's rooms.  Dynamic Channels with "no-truck roll" refers to the ability to deliver Dynamic Channels without having to send a technician to the hotel.

156.    PureHD's third false statement of material fact is misleading because Guest-Tek can, and does, offer remote delivery of Dynamic Channels on-demand.  In fact, Guest Tek's Free-To-Guest Template, reviewed by and approved by Pullen, specifically states:

> **DYNAMIC CHANNELS**--Today's VIP guests and groups demand hotels to deliver programming in their language or their favorite channels.  Guest-Tek can add or subtract channels on a monthly basis to enable hotels to meet those key guests and group.  These additions and subtractions can also be completely remotely, <u>with no truck role</u>.

(Emphasis added on "with no truck role").

157.    Guest-Tek delivers "Dynamic Channels On- Demand with 'no-truck roll'." PureHD is not the only service provider capable of delivering this service.

158.    PureHD's final false statement of material fact is that it is the "only provider that gives hotel 'Turn-On' channel control BACK to the property owner."

45

159.     "Turn-On" channel is the same concept as the hotel's launch page.  As previously discussed, Guest-Tek also can give the hotel control over a "Turn-On" channel or launch page.

160.     Each of PureHD's false statements have been directed at important and material issues for hoteliers and is likely to influence their decision in choosing a service provider. For example, three of the statements tout PureHD's ability as the only company able to deliver the services remotely, i.e., without "truck-roll."

161.     Within the hotel service industry, it is not uncommon for hoteliers to have to take rooms offline, thereby losing revenue, in order to provide access to the rooms to their important and necessary vendors.  Because these offline rooms represent lost revenue, hoteliers are particularly enamored with vendors that can deliver their services remotely.  Hoteliers desperately want to limit or eliminate the need to take fully functioning rooms offline for the use of vendors.

162.     The one false statement which is not based on the ability to provide remote service is predicated on the ability to customize the television's home page or "turn-on" channel. Pullen knows that two major suppliers of video services in the hospitality market do not allow the customer to customize the television's home page.  Hoteliers frequently want customers to be reminded of the hotel when they turn on their television.  Guest-Tek provides this service.

163.     While many service providers in the industry are capable of and deliver the same service which PureHD claim only it can deliver, Pullen's conduct is made only all the more egregious by the fact that the PureHD website juxtaposes PureHD's service within pages of touting Pullen's role and experience with Guest-Tek.

164.     Pullen lists himself as the former Vice-President of North American Sales at Guest-Tek, who managed a team of staff of 19 sales executives, engineers and support staff, and

who participated in Guest-Tek's the video technology development and Internet product strategy. Pullen emphasizes the fact that under his direction, Guest-Tek consistently exceeded sales targets and took "global technology and mind-share lead in the converged solutions of video, voice, and data for the hospitality market."

165.     As the former Vice-President of North American Sales for Guest-Tek responsible for its tremendous growth, clients of both Guest-Tek and PureHD would expect that Pullen understands both Guest-Tek's service capabilities and limitations.  Consequently, when determining which service provider to choose, a client is likely to believe Pullen's and PureHD's representations about PureHD's service and capabilities as compared to Guest-Tek, his former employer.

## COUNT I

### (Violations of the Lanham Act vs. PureHD)

166.     Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

167.     PureHD made false or misleading descriptions of fact and representations of fact on its website about its own abilities and about Guest-Tek's abilities when it listed itself as the "only" provider capable of delivering the services described above.

168.     PureHD's false and misleading statements about it being the "only" provider capable of delivering the services described above is material to consumers of video technology services in the hospitality industry and is likely to influence their purchasing decisions.

169.     PureHD's statements are literally false and actually deceive or have the tendency to deceive a substantial segment of the hospitality industry.

170.    PureHD placed the false or misleading statement in interstate commerce when it published the false statements on its website.  In addition, upon information and belief, PureHD made similar misstatements and representations in printed advertising material distributed at a recent convention in California.

171.    Guest-Tek has been injured or is likely to be injured as a result of the misrepresentations described above, either by direct diversion of sales or by a lessening of goodwill associated with its products.

## COUNT II

### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* v. Pullen)

172.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

173.    Pullen's Guest-Tek laptop computer was a "protected computer" within the meaning of the Computer Fraud and Abuse Act.  Pullen worked out of his home office in Sudbury, Massachusetts.  Pullen regularly used his laptop computer to communicate with Guest-Tek personnel, customers, vendors and other employees throughout the United States.  Further, Pullen used his laptop computer to access Guest-Tek's servers and databases stored in Calgary, Canada.  Pullen used his computer in or affecting interstate and foreign commerce.

174.    Pullen intentionally accessed his computer and Guest-Tek's servers and databases in Canada regularly to download and misappropriate confidential and proprietary information that was without his authorization and or exceeded his authorization.  Additionally, through his Guest-Tek computer, he communicated regularly with Guest-Tek's competitor, SolutionInc., to establish a competing entity.  Finally, he used his Guest-Tek's computer to establish a competing

entity, PureHD. Pullen's conduct constitutes a breach of his fiduciary duty, thus he did not have authorization or exceeded his authorization in such use of Guest-Tek's computer.

175.    Pullen's intentional and unlawful conduct caused damage and losses in excess of $5,000. Specifically, Guest-Tek's damages include, but are not limited to, the fact that Guest-Tek has been forced to hire a forensic expert to assess the scope of damage and loss caused by Pullen's conduct and has lost many many hours away from day-to-day responsibilities causing losses well in excess of $5,000.

## COUNT III

### (Misappropriation of Trade Secrets in Violation of M.G.L. c. 93, §§ 42 and 42A v. Defendants)

176.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

177.    M.G.L. c. 93, § 42 provides, *inter alia*, that whoever steals, unlawfully takes, copies by fraud or deception obtains, from any person or corporation, with intent to convert to his own use, a trade secret, regardless of value shall be liable in tort to said corporation or individual for damages in an amount up to double those found. The statute defines a "trade secret" as including, but not limited to, anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records secret merchandising or management information, procedure or improvement.

178.    Pullen has a statutory duty not to disclose to third parties any confidential information and trade secrets obtained during the course of his employment and he has a legal duty not to convert trade secrets of Guest-Tek to his benefit or the benefit of Defendants. Pullen has stolen, unlawfully taken, concealed, and/or copied Guest-Tek's trade secrets and confidential

and proprietary information by fraud or deception with intent to convert it to its own use and the use of Defendants.

179.    Guest-Tek took reasonable steps to safeguard the secrecy of its trade secrets or confidential information.

180.    In misappropriating the confidential and proprietary information and trade secrets, Defendants acted in willfully and in bad faith.

181.    Pullen's disclosure to Defendants and Defendants' use of Guest-Tek's confidential and proprietary information and trade secrets will give Defendants an unfair competitive advantage over Guest-Tek.  Upon information and belief, Defendants have used Guest-Tek's confidential information and trade secrets to harm Guest-Tek.

182.    Notwithstanding Pullen's duty to preserve the confidentiality of the confidential and proprietary information described above, Pullen and the other Defendants will, unless enjoined, continue to use misappropriated confidential information and trade secrets from Guest-Tek for the benefit of Defendants in violation of G.L. c. 93.

183.    In light of the highly competitive nature of this industry, absent injunctive relief, including an immediate order to return all confidential information, Guest-Tek will suffer severe and irreparable injury as a result of Defendants' use of Guest-Tek's confidential and proprietary information and trade secrets for the benefit of Defendants.

184.    Accordingly, a preliminary and permanent injunction enjoining Defendants from retaining the misappropriated information and from using or disclosing the information is the only remedy that will afford Guest-Tek meaningful relief.

185.   As a result of Defendants' conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be awarded by a jury at trial, which amount should be doubled in the discretion of the Court.

## COUNT IV

### (Breach of Duty Loyalty v. Pullen)

186.   Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

187.   As a trusted employee, privy to Guest-Tek's trade secrets and confidential information, Pullen owed Guest-Tek a duty of loyalty.  This ongoing duty requires Pullen to act in the best interests of Guest-Tek.  Under the circumstances of this case and described above, Pullen was prohibited from, among other things. misappropriating confidential information and trade secrets, disclosing the information, using Guest-Tek's property to establish a competing entity and continuing to receive pay from Guest-Tek while he spent time creating a competing entity.  Pullen's fiduciary duty also prohibits him from working in concert with a competitor to establish a competing entity while still employed at Guest-Tek.

188.   By the above described conduct, Pullen breached his duty of loyalty and thereby harmed Guest-Tek.

189.   As a result of Pullen's conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be determined by a jury at trial.

## COUNT V

### (Aiding and Abetting Breach of Fiduciary Duty v. Lavigne and SolutionInc)

190.   Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

191.   As described more fully herein, Pullen breached his fiduciary duty to Guest-Tek.

192.   As described more fully herein, Lavigne and SolutionInc were aware or should have been aware of Pullen's breaches of fiduciary duty owed to Guest-Tek.

193.   As described more fully herein, Lavigne and SolutionInc actively participated in or substantially assisted in these breaches in such a manner that they could not reasonably be held to have acted in good faith.

194.   Lavigne and SolutionInc's conduct has harmed Guest-Tek.

195.   As a result of Lavigne and SolutionInc's conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be determined by a jury at trial.

## COUNT VI

### (Misrepresentation v. Pullen)

196.   Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

197.   Pullen's course of conduct as described herein constitutes a misrepresentation and deception of Guest-Tek.  Among other things, Pullen's conduct wherein he remained employed at Guest-Tek and deceptively acted as a loyal employee caused Guest-Tek to sustain significant damage.  Pullen repeatedly behaved to Guest-Tek as if he was a loyal employee, including affirmatively stating that he did not intend on leaving Guest-Tek shortly before he resigned, pushing for the development of products seemingly on Guest-Tek's behalf when he knew he was departing so he could use that information for the benefit of PureHD and lying about his ability to work when in fact he was meeting with a competitor to start PureHD were misrepresentations as to material facts about Pullen's employment at Guest-Tek.  Pullen additionally deceived Guest-Tek by repeatedly denying that he has any confidential information and trade secrets.  At

all times, Pullen knew his statements and conduct were false and engaged in this misconduct to continue to have access to Guest-Tek's confidential and proprietary information, receive compensation when it was not earned and maximize the use of the misappropriated confidential information after his employment terminated.

198.   Guest-Tek justifiably relied on Pullen's material misrepresentations and deceptive conduct that he was a loyal employee and was intending to stay at Guest-Tek in to the future by continuing to compensate him, provide him directly with confidential and proprietary information and trade secrets and provide him access to Guest-Tek's exchange servers, which contained other confidential and proprietary information and trade secrets.

199.   Guest-Tek has been damaged by Pullen's misrepresentations and deceptive conduct and seeks an award of damages in an amount to be determined by a jury at trial.

## COUNT VII

### (Breach of the Implied Covenant of Good Faith and Fair Dealing v. Pullen)

200.   Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

201.   Implicit in his employment relationship with Guest-Tek, Pullen was obligated to act in good faith and fairly toward Guest-Tek.

202.   Pullen breached the implied covenant of good faith and fair dealing implicit in his employment relationship by the conduct described above.  Pullen's breach includes but is not limited to his misappropriation of confidential and proprietary information and trade secrets, working in concert with a competitor to set up PureHD, lying about being sick and receiving pay from Guest-Tek when he was actually meeting with a competitor and  refusing to return the misappropriated confidential and proprietary information and trade secrets.

## COUNT VIII

### (Conversion v. Pullen and PureHD)

203.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

204.    PureHD in its corporate capacity, and Pullen in his individual capacity, wrongfully exercised dominion and control over secret business information of Guest-Tek, which all Defendants after demand for turnover of the property, have refused to turnover to Guest-Tek.

205.    As a result of the foregoing Pullen and PureHD are liable for conversion in an amount to be established by a jury at trial.

## COUNT IX

### (Aiding and Abetting Pullen and PureHD's Conversion v. Lavigne and SolutionInc)

206.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

207.    As described more fully herein, Pullen converted Guest-Tek's confidential and proprietary business information and trade secrets.

208.    As described more fully herein, Lavigne and SolutionInc were aware or should have been aware of Pullen's conversion of Guest-Tek's confidential and proprietary business information and trade secrets.

209.    As described more fully herein, Lavigne and SolutionInc nevertheless wrongfully and actively participated in and enabled Pullen to convert Guest-Tek's confidential and proprietary business information and trade secret in such a manner that they could not reasonably be held to have acted in good faith.

210.    Lavigne and SolutionInc's conduct has harmed Guest-Tek.

211.    As a result of Lavigne and SolutionInc's conduct, Guest-Tek has been damaged and seeks an award of damages in an amount to be determined by a jury at trial.

## COUNT X

### (Unjust Enrichment v. Pullen)

212.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

213.    Guest-Tek conferred a benefit by paying Pullen a salary in return for the services rendered on behalf of Guest-Tek.  As a fiduciary, at all times Pullen was expected to work toward the best interests of Guest-Tek.

214.    Pullen accepted a salary from Guest-Tek throughout his employment.

215.    Pullen however did not work for the best interests of Guest-Tek throughout his employment.  In fact, Pullen misrepresented the state of his health, and expended substantial efforts in establishing a competing enterprise while he was supposed to be working in Guest-Tek's best interests.

## COUNT XI

### (Violation of G.L. c. 93A v. PureHD, Lavigne and SolutionInc)

216.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

217.    PureHD is engaged in trade or commerce as defined under G.L. c. 93A.

218.    SolutionInc is engaged in trade or commerce as defined under G.L. c. 93A.

219.    Lavigne is engaged in trade or commerce as defined under G.L. c. 93A.

220.    Guest-Tek is engaged in trade or commerce as defined under G.L. c. 93A.

221.    Pullen took Guest-Tek's trade secrets and confidential and proprietary documents for the benefit of PureHD, SolutionInc, and Lavigne.

222.    The majority of the conduct alleged took place within Massachusetts as Pullen on behalf of PureHD, SolutionInc, and Lavigne misappropriated Guest-Tek's trade secrets, proprietary and confidential information in Massachusetts, Pullen transferred that information to PureHD, SolutionInc, and Lavigne in Massachusetts, and, upon information and belief, PureHD has retained the trade secrets and confidential information at its principal place of business located in Sudbury, Massachusetts.

223.    The conduct of PureHD, SolutionInc, and Lavigne constitutes and unfair and/or deceptive trade practices in violation of G.L. c. 93A, § 11.

224.    Guest-Tek has been damaged by the conduct of PureHD, SolutionInc, and Lavigne in an amount to be determined at trial.

## COUNT XII

### (Civil Conspiracy v. Defendants)

225.    Guest-Tek repeats and realleges each of the preceding allegations as if set forth herein.

226.    Defendants have acted in concert with a common design and/or agreement to cause the breach of Pullen's breach of fiduciary duty, Pullen and PureHD's conversion of Guest-Tek's confidential and proprietary business information and trade secrets and to set up an entity to unlawfully compete with Guest-Tek.

227.    Defendants have acted in concert with a common design and/or agreement to intentionally interfere with Guest-Tek's business and customer relations, prospective relations and employer/employee relations.

228.    Defendants have acted in concert with a common design and/or agreement to misappropriate and misuse Guest-Tek's confidential and proprietary business information and trade secrets in violation of the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42 and 42A.

229.    Defendants have acted in concert with a common design and/or agreement to establish an entity to unlawfully compete with Guest-Tek in violation of M.G.L. c. 93A.

230.    By the conduct described herein, Lavigne and SolutionInc provided Pullen with substantial assistance and encouragement to Pullen to breach his fiduciary duty; provided substantial assistance to Pullen and PureHD to misappropriate Guest-Tek's trade secrets and confidential and proprietary business information; provided substantial assistance to and encouragement to Pullen and PureHD to interfere with Guest-Tek's advantageous and prospective relations and together Defendants established an entity to unlawfully compete with Guest-Tek.

231.    Defendants have taken overt acts in furtherance of the conspiracy including, *inter alia*, converting Guest-Tek's trade secrets, confidential and proprietary information and diverting Guest-Tek's corporate opportunities to PureHD and/or SolutionInc as described above.

232.    Defendants all had knowledge that the conduct described herein was in furtherance of their plan and agreement to, *inter alia*, establish an entity that unlawfully possessed Guest-Tek's misappropriated confidential and proprietary business information and trade secrets, unlawfully interfered with Guest-Tek's advantageous and prospective relations and otherwise unlawfully competed with Guest-Tek.

233.    Guest-Tek has been damaged by PureHD's conduct in an amount to be determined at trial.

**WHEREFORE**, Guest-Tek requests the Court enter the following relief on all counts of the Verified Complaint as appropriate:

1.      A Declaratory Judgment that Defendant Pullen breached his duty of loyalty to Guest-Tek;

2.      A Preliminary Injunction requiring Pullen and PureHD to immediately remove all false statements of fact from any PureHD website and all marketing and advertising materials;

3.      A Permanent Injunction barring Pullen and PureHD from making any false statements of fact as to its capabilities on any PureHD website and all marketing and advertising materials;

4.      A Preliminary Injunction requiring Pullen and PureHD to immediately return to Guest-Tek all USB drives, DVD discs and electronic media to which he copied Guest-Tek information;

5.      A Permanent Injunction requiring Pullen and PureHD to immediately return to Guest-Tek all USB drives, DVDs and electronic media to which he copied Guest-Tek information;

6.      A Preliminary Injunction requiring Lavigne and SolutionInc to immediately return to Guest-Tek all USB drives, DVD discs and electronic media which they received that contain Guest-Tek information;

7.      A Permanent Injunction requiring Lavigne and SolutionInc to immediately return to Guest-Tek all USB drives, DVDs and electronic media to which they received that contain Guest-Tek information;

8.      A Preliminary Injunction enjoining Pullen from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD, Lavigne, SolutionInc or to any other competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, Lavigne, SolutionInc or any other competitor of Guest-Tek. Further, Pullen should be ordered to return all of the trade secrets and confidential information in his possession;

9.      A Permanent Injunction enjoining Pullen from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD, Lavigne, SolutionInc or to any other competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, Lavigne, SolutionInc or any other competitor of Guest-Tek. Further, Pullen should be ordered to return all of the trade secrets and confidential information in his possession;

10.     A Preliminary Injunction enjoining Lavigne from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD, Pullen, SolutionInc or

to any other competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, SolutionInc or any other competitor of Guest-Tek.  Further, Lavigne should be ordered to return all of the trade secrets and confidential information in his possession;

11.      A Permanent Injunction enjoining Lavigne from retaining or transmitting any of Guest-Tek's trade secrets or confidential information to PureHD, Pullen, SolutionInc or to any other competitor of Guest-Tek, and from using any of said information for the benefit of Pullen, PureHD, SolutionInc or any other competitor of Guest-Tek.  Further, Lavigne should be ordered to return all of the trade secrets and confidential information in his possession;

12.      A Preliminary Injunction enjoining Defendants from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information Pullen and the other Defendants misappropriated;

13.      A Permanent Injunction enjoining Defendants from soliciting any clients or potential clients of Guest-Tek identified in the trade secrets or confidential information Pullen and the other Defendants misappropriated;

14.      A Preliminary Injunction enjoining Defendants from retaining, using or transmitting any of Guest-Tek's trade secrets or confidential information.  Further, Defendants should be ordered to return all of the trade secrets and confidential information in their possession;

15.      A Permanent Injunction enjoining Defendants from retaining, using or transmitting any of Plaintiff's trade secrets or confidential information.  Further, Defendants should be ordered to return all of the trade secrets and confidential information in their possession;

16.      A Preliminary Injunction enjoining Defendants or any of their employees from soliciting any clients of Guest-Tek whom any employee of Defendants became aware by virtue of Pullen's or any other former employee of Guest-Tek's employment at Guest-Tek;

17.      A Permanent Injunction enjoining Defendants or any of their employees from soliciting any clients of Guest-Tek whom any employee of Defendants became aware by virtue of Pullen's or any other former employee of Guest-Tek's employment at Guest-Tek;

18.      A Preliminary Injunction directing Defendants to turn over to Guest-Tek for forensic review all computers and removable storage devices in their possession at any time from January 1, 2008 to the present;

19.      An Order that Defendants pay Guest-Tek damages as awarded by a jury at trial or allowed by statute, including double and treble damages and reasonable attorney's fees and costs in this action together with interest on any monetary judgment plaintiff may obtain; and

20.     Such further relief as the Court deems just.

## JURY DEMAND

Guest-Tek demands a trial by jury on all claims and issues so triable.

GUEST-TEK INTERACTIVE
ENTERTAINMENT, INC. and GUEST-TEK
INTERACTIVE ENTERTAINMENT, LTD.

By its attorneys,


 /s/ Gary M. Feldman
Gary M. Feldman, BBO #162070
David M. Cogliano, BBO #630185
Christopher J. Marino, BBO #655007
**DAVIS, MALM & D'AGOSTINE, P.C.**
One Boston Place
Boston, MA  02108
(617) 367-2500

Dated:  March 19, 2010

60