UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GUEST-TEK INTERACTIVE
ENTERTAINMENT INC. and
GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.,
    Plaintiffs,

    v.

THOMAS PULLEN and
PUREHD LTD.,
    Defendants.

CIVIL ACTION NO.
09-11164-MBB


**MEMORANDUM AND ORDER RE:**
**MOTION TO DISMISS COUNTS II AND III OF COUNTERCLAIM**
**(DOCKET ENTRY # 32); PLAINTIFFS MOTION TO AMEND**
**AND ADD GLEN LAVIGNE AND SOLUTIONINC**
<u>**DOCKET ENTRY # 41)**</u>

**July 30, 2010**


**BOWLER, U.S.M.J.**

    Pending before this court is a motion to dismiss counts II and III of a counterclaim filed under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), by plaintiff Guest-Tek Interactive Entertainment Inc. ("Guest-Tek Inc.") and plaintiff Guest-Tek Interactive Entertainment Ltd. ("Guest-Tek Ltd.") (collectively: "Guest-Tek[1] or "plaintiffs" or "defendants-in-counterclaim"). (Docket Entry # 27).

---

[1] The complaint and counterclaim refer to Guest-Tek Inc. and Guest-Tek Ltd. as "Guest-Tek."  (Docket Entry # 1).

In Count II of the counterclaim, defendants Thomas Pullen ("Pullen") and PureHD Ltd. ("PureHD") (collectively: "defendants" or "plaintiffs-in-counterclaim") allege intentional interference with prospective advantageous or business relations by Guest-Tek.  Count III of the counterclaim alleges a violation of section 11 of the Massachusetts General Laws chapter 93A ("ch. 93A") by Guest-Tek.  Both counts stem from alleged communications between Guest-Tek employees and potential PureHD customers. (Docket Entry # 27).  Guest-Tek moves to dismiss these two counts on the basis that the "allegations are vague, conclusory and utterly fail to establish the requisite elements of an intentional interference claim or a violation of ch. 93A." (Docket Entry # 32).

Additionally, plaintiffs move to amend the original complaint pursuant to Rule 15, Fed. R. Civ. P. ("Rule 15") and add Glen Lavigne ("Lavigne") and SolutionInc Limited ("SolutionInc").  (Docket Entry # 41).  Lavigne and SolutionInc oppose the motion to amend on the basis that the motion is futile and was filed with undue delay, dilatory motive and bad faith. (Docket Entry # 49).

## PROCEDURAL BACKGROUND

The ten count complaint (Docket Entry # 1) was originally filed by Guest-Tek on July 9, 2009, seeking injunctive relief and

2

damages.  On August 17, 2009, defendants filed a partial motion to dismiss (Docket Entry # 13) three of the counts against Pullen and PureHD.  On October 19, 2009, the court allowed that motion with respect to Count X, violation of ch. 93A against Pullen, and denied the motion with respect to Count II, under 18 U.S.C. § 1030, the "Computer Fraud and Abuse Act," and Count IX, violation of ch. 93A against PureHD.  (Docket Entry # 24).

On November 6, 2009, defendants submitted an answer and counterclaims.  (Docket Entry # 27).  Currently pending is Guest-Tek's motion to dismiss counts II and III of the counterclaim filed on December 19, 2009.  (Docket Entry # 32).  Plaintiffs-in-counterclaim oppose that motion.  (Docket Entry # 35).  Also pending is plaintiffs' motion to amend the Complaint submitted on March 19, 2010.  (Docket Entry # 41).  Defendants-in-counterclaim oppose the motion to amend. (Docket Entry # 49).


## STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court "accept[s] as true all well pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff."  Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1ˢᵗ Cir. 2009).  "The general rules of pleading require 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Id. (citing Rule 8(a)(2),

Fed. R. Civ. P.).  "This short and plain statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Id.

"To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'"  Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008); see Ashcroft v. Iqbal, __ U.S.__, 129 S.Ct. 1937, 1949 (2009) (addressing the "plausibility standard"). While "detailed factual allegations" are not required, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement for relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic v. Twombly, 550 U.S. 554, 555 (2007); see Maldonado v. Fontanes, 563 F.3d 263, 266 (1st Cir. 2009); see also Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008).  Additionally, "a well-pleaded complaint may succeed even if . . . actual proof of those facts are improbable."  Bell Atlantic v. Twombly, 550 U.S. at 556.

Regarding plaintiffs' motion to amend, Rule 15 instructs the court that leave to amend "'is freely given when justice so requires'" absent an adequate basis to deny amendment such as futility, bad faith, undue delay or a dilatory motive.  See Maine State Building and Construction Trades Council, FFLCIO v. United States Dep't of Labor, 359 F.3d 14, 19 (1st Cir. 2004); Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996).

FACTUAL BACKGROUND

Guest-Tek Ltd. is a Canadian corporation with a principal place of business in Sudbury, Massachusetts.  (Docket Entry # 27).  Guest-Tek Inc. is a wholly owned subsidiary of Guest-Tek Ltd., registered in California with a principal place of business in Irvine, California.  (Docket Entry # 27).  Guest-Tek provides and markets broadband Internet access and video on demand services and equipment to the hospitality and timeshare unit industry. (Docket Entry # 27).

Pullen resides in Sudbury, and is the founder of PureHD, a Canadian corporation which also has a principal place of business in Sudbury.  (Docket Entry # 27).  PureHD is a startup company that delivers high definition television programming through a coaxial platform to hoteliers, universities, restaurants/taverns and health care facilities.  (Docket Entry # 27).  Despite the similarities in services to clients, Guest-Tek and PureHD utilize different technologies in providing these services.  (Docket Entry # 27).

Prior to starting PureHD, Pullen was employed at Guest-Tek as Vice President of IP-on-Demand and subsequently as Vice President of North American Sales from May 1, 2005 through May 3, 2009.  (Docket Entry # 27).  As Vice President of North American Sales, Pullen had access to Guest-Tek's customer lists and

marketing plans.  (Docket Entry # 27).  While still employed by Guest-Tek, Pullen created several files containing emails, calendars and contacts lists on a USB drive as part of his effort to establish a competing new entity.  (Docket Entry # 27). Guest-Tek did not require Pullen to sign any documents restricting where he could work after his employment ended, nor did he sign any agreement with Guest-Tek prohibiting himself, and therefore, PureHD, from soliciting or doing business with Guest-Tek customers or employees.  (Docket Entry # 27).  Pullen's establishment of PureHD prior to his resignation from Guest-Tek, coupled with his upper management position while employed, led to Guest-Tek's investigation into possible illegal activity on the part of Pullen in establishing PureHD.  (Docket Entry # 27).

As part of that investigation, Guest-Tek launched a forensic examination of Pullen's Guest-Tek laptop computer.  (Docket Entry # 27).  The examination revealed that Pullen copied and is currently in possession of pricing responses and contacts from Guest-Tek customers Archon RFP and Waikoloa Beach Marriott Resort, and a password protected document known as the "New Hotel List."  (Docket Entry # 27).  The "New Hotel List" is a list of all new hotels that Marriott plans on opening, including the names and contact information of the owner, manager and franchisee of each individual hotel.  (Docket Entry # 27).

Guest-Tek alleges that these documents are "precisely the

type of information that Guest-Tek (or any company, in any industry) would not want its competitors to possess." (Docket Entry # 1). Pullen admits to possession of these documents, but denies that he has, or will, use it to unfairly compete in the marketplace. (Docket Entry # 27).

Examination also found on Pullen's USB device a file titled "NewCo/SolutionInc." (Docket Entry # 27). SolutionInc is a Canadian corporation incorporated under the Nova Scotia Companies Act with a principal place of business in Halifax, Nova Scotia, Canada. (Docket Entry # 27). Lavigne is the President, Chief Executive Officer and Director of SolutionInc and frequently communicated with Pullen from his home and office in Nova Scotia, Canada. (Docket Entry # 27).

After Pullen's resignation and the formation of PureHD in May 2009, employees of Guest-Tek contacted several persons in the industry based on the Guest-Tek contact lists that were found on Pullen's computer. (Docket Entry # 27). Specifically, Arnon Levy ("Levy"), Guest-Tek's Chief Executive Officer, contacted a consultant and potential referral source for PureHD and informed them that Pullen was being investigated by law enforcement agencies in the United States and Canada for alleged illegal activity. (Docket Entry # 27). In fact, Levy knew no such criminal investigations were being conducted. (Docket Entry # 27).

On May 8, 2009, Guest-Tek's attorney sent a demand letter to Pullen asking him to comply with eight demands or face litigation.  (Docket Entry # 33).  In the letter, Guest-Tek demanded Pullen:

1. to return all documents and electronically stored information,
2. identify all persons he has provided [Guest-Tek] documents to,
3. identify all computers or other devices containing [Guest-Tek] documents,
4. provide the opportunity to inspect all those devices,
5. identify all [Guest-Tek] customers with whom he has contacted,
6. agree not to solicit, contact or communicate with any of Guest-Tek's customer's for two years,
7. agree not to use or disclose any [Guest-Tek] confidential information or trade secrets and
8. to reimburse for any legal fees incurred.

(Docket Entry # 33).

On June 18, 2009, Guest-Tek's attorney telephoned a Guest-Tek customer and potential customer of PureHD.  (Docket Entry # 27).  During the conversation, the attorney asked if the company had been contacted or solicited by Pullen after he left Guest-Tek or PureHD.  (Docket Entry # 27).

Also in June 2009, Don Moore ("Moore"), Guest-Tek's Chief Marketing Officer, threatened to discontinue business relations with an industry vendor if he were also doing business with PureHD.  (Docket Entry # 27).  Additionally, after learning of a voicemail message left by Pullen for an employee of Guest-Tek's stating, "I got lots of business coming forward" (Docket Entry # 27), Guest-Tek informed their employees that any employee found

8

to be communicating with Pullen would be immediately terminated. (Docket Entry # 27).

### DISCUSSION

Plaintiffs-in-counterclaim allege in Count II an intentional interference with business relations claim against Guest-Tek. (Docket Entry # 27).  Count III sets out a violation of section 11 of ch. 93A by Guest-Tek.  (Docket Entry # 27).  Both counts stem from alleged communications between Guest-Tek employees and "potential" PureHD customers.  (Docket Entry # 27).  To support their claim, plaintiffs-in-counterclaim assert four examples of defendants-in-counterclaim's alleged tortious acts.

Defendants-in-counterclaim contend that both counts should be dismissed with prejudice because plaintiffs-in-counterclaim fail to allege with any specificity a business relationship that was harmed as a result of Guest-Tek's conduct.  (Docket Entry # 33).  Plaintiffs also seek leave to amend to add Lavigne and SolutionInc as defendants.  (Docket Entry # 41).

First, this court will address the intentional interference and ch. 93A claims.  The court will then address plaintiffs' motion to amend.

### I.   Intentional Interference with Business Relations (Count II)

Count II of the counterclaim alleges that by and through the

acts of its employees and counsel, Guest-Tek intentionally interfered with Pullen and PureHD's efforts to develop business with prospective customers.  (Docket Entry # 27).  "There are four elements required to establish interference with advantageous business relations:  (1) [plaintiffs-in-counterclaim] had a business relationship for economic benefit with a third party, (2) the [defendants-in-counterclaim] knew of that relationship, (3) the [defendants-in-counterclaim] interfered with the relationship through improper motive or means, and (4) the [plaintiff-in-counterclaim's] loss of the advantage resulted directly from the defendants' conduct."  Fafard Real Estate & Dev. Corp. v. Metro-Boston Broadcasting, Inc., 345 F.Supp.2d 147, 154 (D.Mass. 2004) (citing Kurker v. Hill, 689 N.E.2d 833 (Mass.App.Ct. 1988)).

The Restatement (Second) of Torts § 766 (1979) advises that:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:  (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

To sustain a claim of intentional interference with business relations, "more than just intentional interference must be established," it requires that a defendant's conduct was wrongful

or improper in some way.  United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 (Mass. 1990).  "[T]he plaintiff must prove, among other things, 'the defendant's intentional and malicious interference with' a business relationship or contemplated contract of economic benefit."  Id. (citing ELM Medical Laboratory, Inc. v. RKO Gen., Inc., 532 N.E.2d 675 (Mass. 1989)). It is unnecessary to show there was a binding contract; "an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit is enough."  Owen v. Williams, 77 N.E.2d 318, 322 (Mass. 1948).

Regarding the business relationship element, it is sufficient for the plaintiffs-in-counterclaim to allege that it had a "probable future business relationship anticipating a reasonable expectancy of financial benefit."  American Private Line Services, Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992); Powers v. Leno, 509 N.E.2d 46, 49 (Mass.App.Ct. 1987).  Furthermore, neither an actual or contemplated agreement nor proof of negotiations with a potential buyer is required. American Private Line Services, Inc., 980 F.2d at 36.

Guest-Tek's principal argument is that the claim fails because plaintiffs-in-counterclaim make no allegation that it had an actual business relationship.  (Docket Entry # 32).  Guest-Tek points out that the court in Laser Labs, Inc. v. ETL Testing

Laboratories, Inc., 29 F.Supp.2d 21, 23 (D.Mass. 1998)[2], rejects
an expansive definition of the term "advantageous relations."
(Docket Entry # 32).  As the holding in one court reflects, the
first element is not satisfied "where a plaintiff alleges
interference only with its general efforts to compete for
prospective customers in the market at large."  Katin v. National
Real Estate Information Services, Inc., 2009 WL 929554, *8
(D.Mass. March 31, 2009) (allegations of interference by
unauthorized practice of law in providing conveyancing services
to conveyancing market is insufficient).

On the other hand, a "probable future relationship" will
suffice as long as the plaintiffs "identif[y] the business
relations that have been affected . . . as those between the
[plaintiffs-in-counterclaim] and their 'patients, prospective
patients, and other insurers.'"  Encompass Insurance Company of
Massachusetts v. Giampa, 522 F.Supp.2d 300, 315 (D.Mass. 2007)
(frivolous lawsuit and defaming press release interfered with all
clients and prospective client relations);  see also Fafard Real
Estate & Dev. Corp. v. Metro-Boston Broadcasting, Inc., 345
F.Supp.2d at 154 (D.Mass. 2004) (denying motion to dismiss
because the plaintiff's intent to sell "an attractive investment"
despite lack of negotiations with potential buyer satisfied first

---

[2]  Notably, the Laser court reviewed the sufficiency of the claim
under a summary judgment standard rather than the more lenient
motion to dismiss standard of review.

element).   The issue here is whether the identified relations
fall within this range and thus survive a motion to dismiss as
opposed to a motion for summary judgment.

The plaintiffs-in-counterclaim identify the business
relations interfered with as "Guest-Tek customers" and "Guest-Tek
employees" with whom Pullen and PureHD seek to develop business.
(Docket Entry # 27).   To further support their claim, they
present examples of four business relationships that were
affected by Guest-Tek's alleged interference:   (1) "a consultant
and potential referral source for PureHD"; (2) "a customer of
Guest-Tek and potential customer of PureHD"; (3) "an industry
vendor"; and (4) "Guest-Tek's employees."   (Docket Entry # 27).
Moreover, Pullen admits possession of several Guest-Tek documents
but denies the allegation that he intends to use them to unfairly
compete with Guest-Tek.   (Docket Entry # 27).   These documents
include lists of potential clients that
plaintiffs-in-counterclaim have identified as allegedly
interfered with.[3]   (Docket Entry # 27).

Despite Guest-Tek's assertion that PureHD failed to
denominate by name specific customers or relations, plaintiff-in-
counterclaim's statement that Guest-Tek's Chief Executive

---

[3]   Pullen specifically admits to possession of:   a Request for
Information from the Hyatt Company, a Request for Proposal and
Response from The Archon Hospitality Group, the Waikoloa Beach
Marriott Resort Quote and the "New Hotel List".   (Docket Entry #
1).

Officer, Levy, and Guest-Tek's Chief Marketing Officer, Moore, contacted particular clients is not simply an interference with the market at large.  See <u>Katin</u>, 2009 WL 929554 at *7 (finding that "the lack of any allegations of particular lost customers or sales . . . are sufficient under the <u>Twombly</u> standard to allege an 'injury in fact'").  Defendants are entitled to a reasonable inference that Levy knew PureHD was currently, or likely, to engage in business with the "particular customer," especially since Levy has brought suit alleging Pullen was using Guest-Tek's contact list.  See <u>Encompass Insurance Company</u>, 522 F.Supp.2d at 315 ("defendants are entitled to reasonable inference that plaintiffs had knowledge of these relationships, given the nature of the defendants business"); <u>see also</u> <u>Brandt v. Advance Cell Technology, Inc.</u>, 349 F.Supp.2d 54, 57 (D.Mass. 2003) (on motion to dismiss, court must draw all reasonable inferences in counterclaimants' favor).  Therefore, the intentional interference claim is sufficient for purposes of a motion to dismiss.

Additionally, the counter-claimant's allegation that Guest-Tek's attorney "contacted several customers," and as an example one "potential vendor" and one "potential referral source," satisfies the plausibility requirement of the first element.  See <u>Encompass Insurance Company of Massachusetts v. Giampa</u>, 522 F.Supp.2d at 315 (allegation of interference with

14

"all clients and prospective client relations" sufficient to satisfy pleading requirements).  In its ch. 93A defense, Guest-Tek does not contest that it contacted clients and potential clients of PureHD, including that those contacts were not "improperly questioned."  (Docket Entry # 36). Defendants-in-counterclaim are able to identify the clients the alleged "improper questioning" was directed towards, thus demonstrating knowledge of which client, despite being unnamed in the counterclaim, is "the ground[] upon which the claim rests." Gargano v. Liberty Int'l Underwriters, 572 F.3d at 48-49 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 555 (referring to the standard for motion to dismiss)).  Moreover, Guest-Tek originated this suit because it feared that PureHD and Pullen were going to use its client lists to "unfairly compete" with Guest-Tek's customers.  See, e.g., Fafard, 345 F.Supp.2d at 154 (recognizing that the plaintiffs would not have sued if it was not aware of at least the possibility of a transaction occurring).

Finally, plaintiffs-in-counterclaim allege an interference with Guest-Tek's employees as potential employees for PureHD. (Docket Entry # 27).  While the counterclaim does not name any particular employee, it is more specific than allegations simply of interference with the employment market at large.  Compare Laser Labs, Inc. v. ETL Testing Laboratories, Inc., 29 F.Supp.2d 21, 24 (D.Mass. 1998) (existence of "potential market" is too

expansive to constitute an "advantageous relationship" for purposes of summary judgment); with United Air Lines, Inc. v. Gregory, 2010 WL 2037283, *6-7 (D.Mass. May 20, 2010) (sufficient to allege a "business relationship" where the plaintiff had a reasonable expectation to sell its product).  Guest-Tek's employees represent a particular market of potential employees that Pullen had previous business relationships with and was likely to interact with again.  As Vice President of North American Sales, Pullen managed and interacted with many of Guest-Tek's employees.  It is highly probable, and within the course of lawful competition, that Pullen would seek to entice Guest-Tek employees he knows to have a particularly attractive skill set he wishes to employ.  See Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419 (Mass. 1991) ("an at-will employee may properly plan to go into competition with his employer" and "may secretly join other employees in the endeavor without violating any duty to his employer").[4]  It is also likely that discovery will produce the names of the aforementioned business relationships and thus plaintiffs-in-counterclaim plausibly allege both the existence and defendants' knowledge of a business relation.

For the third element, plaintiffs-in-counterclaim must

---

[4]  The legality of PureHD's communications with certain Guest-Tek employees is a pending issue in this case.  The current matter is whether Guest-Tek's banning of communications with Pullen or PureHD is actionable under a Rule 12(b)(6) standard of review.

allege that the interference was wrongful because Guest-Tek
interfered through improper means or motives.  See Encompass
Insurance Company of Massachusetts, 522 F.Supp.2d at 314-315
("without intent to interfere, there can be no liability since a
negligent interference is not actionable") (citing Spencer Cos.,
Inc. v. Chase Manhattan Bank, N.A., 81 B.R. 194, 204 (D.Mass.
1987)).  Guest-Tek contends that its actions were within the
confines of competitive conduct.  See Id. at 315 (claim dismissed
when "none of the counterclaims contain[] allegations that [the
plaintiff] acted with an intent to interfere with any of the
defendants' business or contractual relationships"); see also
Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 815
N.E.2d 241, 246 (Mass.App.Ct. 2004) ("legitimate advancement of
its own economic interest . . . is not 'improper' for purposes of
a tortious interference claim").  Improper conduct "may include
ulterior motive (e.g. wishing to do injury) or wrongful means
(e.g. deceit or economic coercion)."  Hertz Corp. v. Enterprise
Rent-A-Car Company, 557 F.Supp.2d 185, 196 (D.Mass. 2008);
Schwanbeck v. Federal-Mogul Corp., 578 N.E.2d 789 (Mass. 1991).[5]

---

[5]  Section 767 of the Restatement (Second) of Torts (1979) sets
out additional factors that might be considered in determining
whether a defendant's intentional interference with a prospective
business relation should be deemed improper:
      (a) the nature of the actor's conduct, (b) the actor's
      motive, (c) the interests of the other with which the
      actor's conduct interferes, (d) the interests sought to be
      advanced by the actor, (e) the social interests in
      protecting the freedom of action of the actor and the

Here, the plaintiffs-in-counterclaim allege that Guest-Tek's "communications with its employees and other [customers] in the industry were intended to . . . restrict and chill" PureHD from soliciting and doing business with those customers, and hiring its employees.  (Docket Entry # 27).  Additionally, the counterclaim alleges that Guest-Tek's legal actions were intended to waste the money and resources of its smaller competitor. (Docket Entry # 27).

In its supporting memorandum, Guest-Tek states, "[w]ith the exception of the allegation that Mr. Levy supposedly told a 'prospective referral source' Mr. Pullen was being investigated for criminal conduct, Defendants[sic] have not established any possible improper motive or means."  (Docket Entry # 33).  The allegation regarding Levy's informing a prospective referral source that Pullen was being investigated for criminal conduct establishes at least the plausibility of intentional interference through improper motive or means.  See, e.g., Draghetti v. Chmielewski, 626 N.E.2d 862 (D.Mass. 1994) (false accusation of impropriety motivated by retaliation and ill will).

Similarly, prohibiting Guest-Tek employees from speaking with Pullen by means of threat serves as "an improper means of restricting competition in a free market."  Moore v. La-Z-Boy,

_____

contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

18

<u>Inc.</u>, 639 F.Supp.2d 136, 143 (D.Mass. 2009).  "If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement." <u>Augat, Inc. v. Aegis, Inc.</u>, 565 N.E.2d at 419 (Mass. 1991).  "The general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged."  <u>Id.</u>

Plaintiffs-in-counterclaim contend that Guest-Tek's counsel attempted to "chill" and "restrict" PureHD's potential business relationships in the following manner:  (1) "an attorney representing Guest-Tek called a customer of Guest-Tek and a potential customer of PureHD"; and (2) a demand letter sent to Pullen.[6]  (Docket Entry # 35).  Guest-Tek claims that "[t]his type of pre-litigation investigation is precisely what is required by the Federal Rules of Civil Procedure," specifically, Rule 11(b), Fed. R. Civ. P. and Rule 26(a)(1)(E), Fed. R. Civ. P. (Docket Entry # 35).  An attorney's communication with a third party is privileged by litigation "only where the proceeding is contemplated in good faith and is under serious consideration." <u>Smith v. Suburban Restaurants, Inc.</u>, 373 NE.2d 215, 217-218 (Mass. 1978) (no privilege for copy of attorney's demand letter sent to police station); <u>see also</u> <u>Brooks Automation, Inc. v.</u>

---

[6]  In its supporting memorandum, Guest-Tek seeks to separately dismiss the counterclaims regarding the attorney's actions.

Blueshift Technologies, Inc., 2006 WL 307948 at *2 (Mass.Super.
2006) ("if the filing of the civil action was not itself
wrongful, neither a tortious interference nor a Chapter 93A claim
may rest solely on [the attorney's action]"[7]).

Accordingly, this court turns to whether the attorney's
investigatory questions to the potential clients were made in
good faith.  See United States v. Gertner, 65 F.3d 963, 966 (1st
Cir. 1995); United States v. Powell, 379 U.S. 48, 57-58 (1964).
Guest-Tek must show there was a legitimate purpose to the
investigation, the information sought was relevant to the
purpose, the information was not already in the possession of the
plaintiff, and that Guest-Tek followed the proper procedures in
issuing the demand letter.  See United States v. Powell, 379 U.S.
at 57-58 (referring to the good faith test for pre-litigation
investigation).  Here, Guest-Tek suspected Pullen of soliciting
its clients through the improper use of its client lists.
(Docket Entry # 1).  The only means of dispelling this suspicion
was to ask its clients.  Regardless of whether the attorney's
actions were protected by privilege, asking clients who they have
communicated with or been solicited by does not by itself grant
the inference of bad faith.  See Hertz Corp. v. Enterprise
Rent-A-Car Company, 557 F.Supp.2d at 189-190 (D.Mass. 2008)

---

[7]  Defendant Brooks, sent a copy of the complaint served to
Blueshift to a prospective customer before it had served or
notified defendants of its filing.

(dismissed "when plaintiffs have not alleged any facts to support the claim that a run-of-the-mill 'due diligence' question was in any respect 'unusual' or untoward").  For the foregoing reasons, it is implausible that the attorney's conduct was made with improper means or motive.

Plaintiffs-in-counterclaim also allege that a pre-litigation demand letter sent by Guest-Tek's attorney was intended to "chill" Pullen's efforts at establishing PureHD.  (Docket Entry # 27).  Specifically, they allege that the demand letter made erroneous legal threats "to force its smaller competitor to waste money and resources responding to its threats."  (Docket Entry # 27).

The purpose of a demand letter in the ch. 93A context is to facilitate the settlement and damage assessments of a potential claim and is a procedural requirement for section nine of ch. 93A.  See Smith v. Suburban Restaurants, Inc., 333 N.E.2d at 204.  The demand letter in question does not lead to an inference of being improper, but rather notifies Pullen and PureHD of the impending claim and allows the opportunity to avoid the claim.  See Fickes v. Sun Expert, Inc., 762 F.Supp. 998 (D.Mass. 1991) (ch. 93A, § 11 claim does not require, but does not bar, a plaintiff from first issuing a demand for relief to the defendant).  For these reasons, this court allows the motion to dismiss with regard to the attorney's demand letter.

21

What is noticeably absent from the counterclaim is the
allegation of a specific sought or lost business relationship.
At this stage, however, it is sufficient to allege that through
the improper acts of their employees and attorney, Guest-Tek has
"embarked on a concentrated effort to interfere with the ability
of Pullen, and PureHD, to develop business" and have
"restrict[ed]" and "chilled" their efforts to solicit Guest-Tek
customers.  (Docket Entry # 27); see Katin, 2009 WL 929554 at *6
(mere presence in the marketplace as an unlawful competitor is
sufficient to allege a loss of prospective customers); see also
Adams v. Watson, 10 F.3d 915 (1st Cir. 1993) (adopting the
"competitor standing doctrine [as] a method of analyzing the
likelihood and imminence of a particular type of actual economic
injury").  The allegations in the counterclaim survive a Rule
12(b)(6) dismissal.

In sum, plaintiffs-in-counterclaim set forth a plausible
claim of interference with advantageous business relations.  The
motion to dismiss Count II of the counterclaim, with exception to
the attorney's conduct therefore lacks merit.


II.  Violation of ch. 93A, § 11 (Count III)

In their third claim, plaintiffs-in-counterclaim allege that
Guest-Tek's efforts to interfere with potential business
relations constitute an "unfair method of competition and/or

unfair and deceptive acts and practices" under section 11 of ch. 93A.  Section 11 provides a cause of action to "[a]ny person who . . . suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade . . . of an unfair method of competition or an unfair or deceptive act or practice."  Mass. Gen. L. ch. 93A, § 11.  Guest-Tek argues that Count III should be dismissed because plaintiffs-in-counterclaim have failed to establish that Guest-Tek engaged in unfair and deceptive conduct or that plaintiffs-in-counterclaim suffered a harm as a result of the alleged conduct.  (Docket Entry # 33).

In determining a ch. 93A violation, the court must assess whether Guest-Tek used or employed an unfair or deceptive act or practice declared unlawful by the act.  A ch. 93A claim "requires a showing of conduct that:  (1) 'falls within the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) 'causes substantial injury to [consumers or other business persons].'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 107 (1st Cir. 2009) (citing Jasty v. Wright Med. Tech., Inc, 528 F.3d 28, 37 (1st Cir. 2008)).

A deceptive act is one in which it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."  See Lowell Gas Company v. Attorney

General, 385 N.E.2d 240, 249 (Mass. 1979).  Deceptive acts, for instance, include "representing that goods or services have a sponsorship, approval, status, affiliation or connections which they in fact lack." Mass. Sch. Of Law v. Am. Bar Ass'n, 952 F.Supp. 884, 891 (D.Mass. 1997).

Plaintiffs-in-counterclaim allege that by interfering with its prospective business relations, Guest-Tek has engaged in unfair and deceptive conduct.  (Docket Entry # 33).  "If [plaintiffs-in-counterclaim] can prove the elements of a tortious interference with contract, then it may also prevail in proving that these same acts constituted an unfair or deceptive act or practice in trade or commerce in violation of [ch. 93A]." See Brooks Automation, Inc. v. Blueshift Technologies, Inc., 2006 WL 307948 at *2.  As previously discussed, plaintiffs-in-counterclaim have stated a claim of interference with advantageous business relations in regards to their communications with potential customers and employees. Accordingly, the motion to dismiss the ch. 93A claim will be denied as it relates to the remaining underlying counterclaims and allowed insofar as it relates to the dismissed claims.  See Encompass Insurance Company of Massachusetts v. Giampa, 522 F.Supp.2d at 316 (motion to dismiss 93A claim denied when underlying motion to dismiss defamation claim also denied); Fafard Real Estate & Dev. Corp. v. Metro-Boston Broadcast, 345

F.Supp.2d at 154 ("argument that the . . . interference with advantageous relations claim[] cannot support a claim of unfair and deceptive business acts or practices, is simply wrong").

A ch. 93A claim cannot be brought "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act occurred primarily and substantially within the commonwealth."  Mass. Gen. L. ch. 93A, § 11.  Furthermore, as explained by one court:

> the decision as to whether "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth" must be made on the basis of factual findings.  Since a Court does not make such findings when ruling on a motion to dismiss, it would seem that a motion to dismiss is no longer an appropriate vehicle for raising the issue.

Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F.Supp.2d 102, 118 (D.Mass. 2003).

In any event, whether the defendant satisfied its burden on this point is a question of law for the court.  See Roche v. Royal Bank of Canada, 109 F.3d 820, 829 (1st Cir. 1997).  For purposes of a motion to dismiss, a "section eleven cause of action . . . should survive a 'primarily and substantially' challenge so long as the complaint alleges that the plaintiff is located, and claims an injury in Massachusetts."  Back Bay Farm, LLC. v. Colluccio, 230 F.Supp.2d 176, 188 (D.Mass. 2002); see Amcel Corp. v. Int'l. Executive Sales, Inc., 170 F.3d 32 (1st Cir. 1999).  Here, both Pullen and PureHD are primarily located in

Massachusetts.[8]  Furthermore, the harm that has been alleged (restriction of their business activities) manifests itself at their principal place of business in Massachusetts.  Therefore, the claim occurred "primarily and substantially" in Massachusetts for purposes of the motion to dismiss.

III.  <u>Motion to Amend Original Complaint</u>

On March 19, 2010, plaintiffs filed a motion for leave to amend the complaint and add SolutionInc and Lavigne pursuant to Rule 15.  Defendants oppose the motion to amend on the basis that it has been filed with undue delay, dilatory motive, futility and bad faith.  (Docket Entry # 49).

Amendment of pleadings is largely a matter within the discretion of the district court.  <u>Farkas v. Texas Instruments, Inc.</u>, 429 F.2d 849, 851 (1st Cir. 1970).  Leave to amend under Rule 15 "is freely given when justice so requires" absent an adequate basis to deny amendment such as futility, bad faith, undue delay or a dilatory motive.  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Maine State Building and Construction Trades Council, AFLCIO v. United States Dep't of Labor</u>, 359 F.3d at 19; <u>Glassman v. Computervision Corp.</u>, 90 F.3d at 622.

Defendants rely on undue delay as a basis to deny the

---

[8]  Although incorporated in Canada, PureHD's principal place of business is in Massachusetts.

motion.   (Docket Entry # 49).   "While courts may not deny an
amendment solely because of delay and without consideration of
the prejudice to the opposing party . . . it is clear that 'undue
delay' can be a basis for denial."   Hayes v. New England Millwork
Distributors, Inc., 602 F.2d 15, 19 (1st Cir. 1979); see Aoude v.
Mobil Oil Corp., 892 F.2d 1115, 1121 (1st Cir. 1989) (upholding
district court's decision to deny amendment on basis of undue
delay); Johnston v. Holiday Inns, Inc., 595 F.2d 890, 896 (1st
Cir. 1979).   "Where a considerable period of time has passed
between the filing of the [pleading] and the motion to amend,
courts have placed the burden upon the movant to show some 'valid
reason for his neglect and delay.'"   Hayes, 602 F.2d at 17-20
(delay of more than two years sufficient to shift burden).

    Given that plaintiffs filed this motion within six months
after service of an expedited discovery order and eight months
after filing of the original complaint, that timeframe is
insufficient to deny the motion on the basis of undue delay
alone.   Compare Grant v. News Group Boston, Inc., 55 F.3d 1, 6
(1st Cir. 1995) (noting "while the slightly more than
fourteen-month delay between the initial complaint and the motion
to amend is not unprecedented, it is considerable, especially in
view of the fact that the motion came after the close of
discovery (which had already been twice extended)"); and Farkas
v. Texas Instruments, Inc., 429 F.2d at 851 (filing motion two

years after complaint is a sufficient length of time to shift
burden to the movant); with City of Manchester v. National Gypsum
Co., 637 F.Supp. 646, 656 (D.R.I. 1986) (holding that a motion to
amend complaint to add parties after discovery of documents and
test results indicated that added party was involved and was made
in good faith in its delay despite coming late in the suit).

While it is true that plaintiffs knew of SolutionInc and
Lavigne's involvement and mentioned them in their original
complaint (Docket Entry # 1), defendants' argument that the two
parties should have been joined in the original complaint falls
short.  (Docket Entry # 50).  In the original complaint,
plaintiffs alleged that Pullen was working in concert with
Lavigne and SolutionInc while he was establishing PureHD.
(Docket Entry # 1).  Although a relationship was suspected to
exist, they did not know the extent of SolutionInc and Lavigne's
involvement until discovery allowed further examination.  (Docket
Entry # 51).  Where, as here, discovery led to previously unknown
facts illuminating the extent of SolutionInc and Lavigne's
involvement in the alleged illegal activities, denial of the
amendment is inappropriate.  For example, Guest-Tek now alleges
in greater detail the extent to which Pullen shared confidential
business information, trade secrets and pending Guest-Tek
contracts to Lavigne and SolutionInc.  (Docket Entry # 51).  They
now have evidence that PureHD identified SolutionInc as a

"partner" in its proposal to one of Guest-Tek's customers.
(Docket Entry # 42).  Additionally, Guest-Tek now alleges that
Lavigne and SolutionInc recruited and hired a Guest-Tek employee
with the aid of Pullen, for the purpose of helping replicate
Guest-Tek's "Free-to-Guest" technology.  (Docket Entry # 42).
This is not a situation in which the delay in moving to amend can
be attributed to the plaintiffs allowing their case "to lie
fallow."  Hayes, 602 F.2d at 20 (denying motion to amend when
case was dormant for two years and amendment prompted only when
appellee moved for judgment on the pleadings).  Guest-Tek claims
that it would have been inappropriate to file a claim against
Lavigne and SolutionInc based on the "few fragments of
information it possessed when they filed its original complaint."
(Docket Entry # 51).

     Additionally, defendants argue that Guest-Tek filed the
motion to amend in bad faith and dilatory motive in order to
"maximize legal fees" to damage the smaller competitor.  (Docket
Entry # 49).  To the contrary, Guest-Tek's filing of the motion
promptly after the discovery of SolutionInc and Lavigne's roles,
is indicative of a good faith motive.  See City of Manchester,
637 F.Supp. at 656 (good faith evident when motion has not come
so late in the course of this suit that it will unreasonably
delay or prejudice the parties).  Furthermore, it is difficult to
find dilatory motive when Guest-Tek is still waiting for

documents requested in January.  (Docket Entry # 51).  Due to the delay in document production, SolutionInc and Lavigne have not been prejudiced, since no depositions have taken place. Therefore, neither bad faith nor dilatory motive warrant denying the amendment.

Futility of a proposed amendment "is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)."  Hatch v. Dep't for Children, Youth and their Families, 274 F.3d 12, 19 (1st Cir. 2001).  Defendants argue that the alleged violations of ch. 93A by SolutionInc and Lavigne is futile.  (Docket Entry # 49).  An allegation is futile if the proposed amendment fails to state a claim to which relief can be granted.  Abraham v. Woods Hole Oceanographic Institute, 553 F.3d 114, 117 (1st Cir. 2009) (citing Glassman v. Computervision Corp., 90 F.3d at 623).  Defendants argue that the alleged violation of ch. 93A fails on the basis that the conduct of the claims did not "substantially take place in Massachusetts" and is therefore not actionable.  (Docket Entry # 49).

As previously discussed, this court denied defendants' motion to dismiss the ch. 93A claims against PureHD, another Canadian entity, for the same basis and only allowed defendants' motion to dismiss against Pullen based on the intra-enterprise exception.  (Docket Entry # 24).  It is true that ch. 93A excludes those disputes "stemming from an employment relationship

30

because they are more similar to purely private disputes and are
not commercial transactions." Mass. Gen. L. ch. 93A, § 11.
Neither Lavigne nor SolutionInc are employees of Guest-Tek and
thus the intra-enterprise exception of ch. 93A does not apply.
Therefore, the motion to amend and add Lavigne and SolutionInc is
allowed.


CONCLUSION

In accordance with the foregoing discussion,
defendants-in-counterclaim's motion to dismiss counts II and III
(Docket Entry # 32) is **ALLOWED** with respect to Guest-Tek's
attorney's conduct, and **DENIED** in regards to all other alleged
conduct.  Additionally, plaintiffs' motion to amend (Docket Entry
# 41) is **ALLOWED.**


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge